**UNITED STATES, Appellee,**

v.

**Steven D. ALEXANDER, Electronics Technician Third Class, U.S. Naval Reserve, Appellant.**

**No. 45617.**

**NMCM 82–0202.**

U.S. Court of Military Appeals.

June 18, 1984.

For Appellant: *Lieutenant Lois B. Agronick, JAGC, USNR* (argued); *Gary W. Ramaeker, Esq.* (on brief).

For Appellee: *Lieutenant Sandra R. Ganus, JAGC, USNR* (argued); *Commander W.J. Hughes, JAGC, USN* (on brief).

*Opinion of the Court*

COOK, Senior Judge:

A general court-martial with members convicted appellant, contrary to his pleas, of a single specification of involuntary manslaughter, in violation of Article 119, Uniform Code of Military Justice, 10 U.S.C. § 919. He was sentenced to reduction to pay grade E–2 and confinement at hard labor for 3 years. The convening authority approved the sentence as adjudged, but suspended confinement at hard labor in excess of 2 years. The Court of Military Review affirmed, and this Court granted review of issues [1] relating to the admissibil-

---

1. The issues were styled in the following terms:

I

THE COURT OF MILITARY REVIEW ERRED IN DETERMINING THE MILITARY JUDGE PROPERLY ALLOWED INADMISSIBLE HEARSAY INTO EVIDENCE WHEN HE PERMITTED THE NAVAL INVESTIGATIVE SERVICE AGENT TO TESTIFY AS TO WHAT THE INTERPRETER TOLD HIM APPELLANT'S SPOUSE HAD SAID DURING INTERVIEWS AT HIS OFFICE AND AT THE POLICE STATION.

II

THE COURT OF MILITARY REVIEW ERRED IN DETERMINING THE MILITARY JUDGE PROPERLY DENIED APPELLANT'S MOTION TO SUPPRESS HIS PRETRIAL STATEMENT TO N.I.S. AGENT DONALD R. HARTMAN.

ity of appellant's pretrial statement and those of his wife. The first issue we consider is the admissibility of appellant's pretrial statement.

Appellant was an electronics technician at a Naval communications station in Japan. At the time of trial, he was twenty-four years old and married to a twenty-year-old Japanese national. They had an infant son, Ian Thomas Alexander, who was born on April 20, 1980. On January 7, 1981, Ian died—as a result of inadequate nourishment and medical attention, according to the medical experts. The actual cause of death was bronchial pneumonia which was induced by the child's deteriorated condition. Appellant's wife discovered the baby dead in his crib at about 1000 on January 8, 1981.

Appellant was immediately called home from work, and an ambulance with a doctor in attendance was dispatched from the nearest medical facility. All the parties proceeded to the hospital. The physicians immediately suspected child abuse. The child was emaciated; there appeared to be bruise marks and cigarette burns on his body (pathologists subsequently attributed these latter symptoms to other, nonmalevolent factors); and his body was positively frigid. Among other things, the physicians suspected that he had been placed in a refrigerator. The Naval Investigative Service (NIS) was contacted immediately by hospital personnel, as were the Japanese police. The presumption on the part of the United States authorities was that the Japanese would assert primary jurisdiction.

The medical facility commander instructed one of the doctors, Lieutenant Susan Robertson, to make certain that the Alexanders remained at the hospital until the Japanese police arrived. Robertson, a pediatrician who had treated Ian while he was alive, took the Alexanders to her office to await the arrival of the Japanese police. NIS Agent Donald Hartman was already present, having been in the operating room while the body was being examined. Hartman was receiving his information from Dr. Matthew Wood, the physician who had met the child in the ambulance. Hartman

and Robertson had not discussed the case, except to the extent that Hartman may have overheard comments by Robertson as she was examining the body.

In her office, Dr. Robertson took it upon herself to get some medical information from the parents. She knew that a report would have to be prepared by the doctors and did not, at the time, know whether it would be up to her or one of the other doctors. (It later developed that Dr. Wood was assigned to prepare the report.) Robertson knew that "legal" had been called in, and she strongly suspected child abuse. She, therefore, deliberately tried to avoid broaching the subject of child abuse. She spoke with the Alexanders for approximately ten to twenty minutes. Afterwards, the Alexanders were left to walk around the hospital grounds by themselves, while Robertson typed up a memorandum of their discussion. This is what her memorandum stated:

Baby slept in a separate room. He was kept there all the time since the rest of the house was very cold. His room had an electric heater, which was on all the time.

We discussed general development. Ian did not yet walk or crawl. He always stayed in his large crib. Would sit up to play with mobile toy hung above the crib. He babbled, but did not say any specific words.

At his 6 months checkup in October, the baby appeared to have a rash. I apparently referred the family for the 2nd time to the Pediatrics Dept in Yokosuka. They saw Dr. Goodman, who felt the baby might have a milk allergy, and switched the formula to Isomil, a soy formula. At that time it was also recommended to start the baby on solid foods. The father says Ian thereafter drank 32 oz. of formula daily, supplemented by various jar baby foods.

Tuesday, 6 JAN 80 [sic], parents say baby acted sick, listless, but did not vomit or have diarrhea. They gave him Tylenol 0.3cc every 4 hours. The following day he appeared somewhat better and took formula. He was not as active as usual, however. Parents were unable to

say whether infact (sic) had a temperature.

Father claims when mother went to feed infant at 1000 today the baby did not respond.

After the Alexanders walked about the hospital grounds for awhile, they were interviewed by Agent Hartman. Hartman, of course, also suspected the Alexanders of child abuse, and he so informed them. In addition, he gave appellant the "standard" Article 31(b) [2] rights advisement. While he knew that Dr. Robertson and possibly other doctors had spoken to appellant, he made no attempt to "cleanse" any prior taint which may have accrued as a result of other conversations. *See United States v. Seay*, 1 M.J. 201 (C.M.A. 1975).

After appellant waived his rights, he admitted the following things: that he had last seen Ian alive at about 1600 hours on the afternoon of January 6; that it was not at all unusual for him not to see Ian for two or three days at a time; that he left the total care and feeding of Ian to his wife; that at first it was nice to have a son, but gradually he "grew away" from Ian; that he seldom picked Ian up or held him; that it had been "months and months" since he had personally fed Ian; that he knew Ian had been ill; that he did not think Ian was seriously ill and overruled his wife's suggestion to take him to the dispensary; that he had previously taken Ian to the well-baby clinic because he had been chronically thin and not very active, and he was advised there to take Ian to the clinic weekly for weight checks; that they did not do that; that he and his wife would leave the baby unattended at home four or five times a week while they went to the base to "socialize"; that on the 7th of January (the day Ian died), appellant was at his duty station when his wife picked him up at about 1400; that they left Ian alone in the apartment while they transact-

ed certain business and "socialized" until about 2300 hours that evening; and that, when they returned home, he did not look in on his child, though he thought his wife did. [The pathologists estimated that Ian had been dead for 7 hours at that time and it was not for another 11 hours that the death was discovered.]

Though Hartman was aware that Dr. Robertson had interviewed appellant, he assumed it was for medical purposes and did not, at the time of his interview, know the content of Robertson's interview. After Hartman concluded his interview (because the Japanese police had arrived to take appellant and his wife away), Robertson asked Hartman if he wanted her memorandum for his investigative purposes. Hartman accepted the memorandum, without paying particular attention to it. Later, in reading it, he concluded that it had no investigative value.

For his part, appellant testified at an Article 39(a) [3] session that he knew Dr. Robertson fairly well, having seen her a number of times in connection with Ian. He explained that he spoke to her that afternoon basically as a friend, because he needed someone to talk to. He did not remember what they talked about. Dr. Robertson told him that Agent Hartman wanted to talk to him, and, because he had already talked to Dr. Robertson, it was "easier" for him to talk to Hartman. He did not think he would have talked to Hartman if he had not already talked to Robertson, because he did not know Hartman. At the time he spoke with Dr. Robertson, and even after Agent Hartman advised him that he was suspected of having committed a crime, appellant did not feel he had done anything wrong. His main concern at the time was to find out what had happened to his son.

After taking evidence and hearing argument of counsel, the military judge made

---

2. Article 31(b), Uniform Code of Military Justice, 10 U.S.C. § 831, provides that:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does

not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

3. Article 39(a), UCMJ, 10 U.S.C. § 839(a).

the following findings with respect to the defense motion to suppress appellant's pretrial statement:

1.) That Agent Hartman did not know of the facts of the prior statement to Dr. Robertson at the time he interviewed the accused;

2.) That the accused was not in any way compelled or impelled by the prior statement to make the statement to Agent Hartman;

3.) That the statement to Agent Hartman was in no way tainted by the prior statement;

4.) That the accused was properly advised by Agent Hartman of his Article 31 and counsel rights and that the accused freely, knowingly and intelligently waived his right against self-incrimination and his right to counsel;

5.) That the accused was not misled or confused by the previous advice concerning Japanese interrogation [4]; and

6.) That the statement to Agent Hartman, was therefore by a preponderance of the evidence, voluntarily made.

On this basis, the military judge denied the motion, and appellant's pretrial statement to Hartman, as summarized above, was admitted in evidence.

■ Appellant contends, citing *United States v. Seay, supra,* that his interrogation by Hartman was tainted by his prior conversation with Dr. Robertson, and that nothing intervened between the two events to purge the taint. *Seay* identified the following factors to consider in determining whether a taint had been purged:

the time lapse between the questioning periods, whether the accused was again questioned by the individual who obtained the prior inadmissible statement, whether the accused himself made an acknowledgment that his prior admissions did not influence his decision to incriminate himself again, and whether

the interrogator relied upon the prior admissions in seeking a subsequent statement.

1 M.J. at 204.

However, on these facts, we agree with the military judge that there was no primary taint. Such a taint occurs when illegal official conduct has caused an accused to "let the cat out of the bag." *See United States v. Butner,* 15 M.J. 139 (C.M.A. 1983). As far as this record reveals, nothing occurred at the Robertson interview which, in our opinion, either incriminated appellant or compelled him to make incriminating admissions to Agent Hartman. Granted, it was an extremely risky endeavor for Robertson to interview appellant at all at that point, and it would have been better practice if Hartman, out of an abundance of caution, had given a cleansing rights-advisement. *See United States v. Seay, supra.* However, due to the lack of taint, the standard rights-advisement issued here by Hartman was sufficient for Article 31(b) purposes. Accordingly, the military judge did not err in receiving appellant's statement in evidence.

■ The remaining issue concerns the admissibility of Mrs. Alexander's pretrial statements. Two such statements were taken by the authorities, through the aid of interpreters. However, it appears that they were so similar in content to appellant's own admissions that they were merely cumulative and could not have contributed significantly to appellant's conviction. Under these circumstances, it is unnecessary for us to resolve the merits of this issue in order to decide the case, and we decline to further increase the already considerable corpus of legal dicta.

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.

---

4. It appears that while appellant was still at the medical center, before the Japanese police arrived, he was advised by a United States international law officer of his rights under Japanese law. This was because all of the United States officials assumed that the Japanese authorities would exercise their right of primary jurisdiction in the case. There is no indication that this rights advisement was erroneous in any respect. However, not surprisingly, it appears that appellant's rights under Japanese law differed substantially from those under United States law.