UNITED STATES, Appellee,

v.

**Staff Sergeant Ricardo VALDEZ,
462–11–9213, United States
Army, Appellant.**

**ACMR 9002264.**

U.S. Army Court of Military Review.

14 July 1992.

---

For Appellant: Captain Emmett G. Wells, JAGC (argued); Captain James M. Heaton, JAGC (on brief).

For Appellee: Major Edith M. Rob, JAGC (argued), Lieutenant Colonel Daniel J. Dell'Orto, JAGC (on brief).

Before JOHNSON, WERNER, and GRAVELLE, Appellate Military Judges.

## OPINION OF THE COURT

GRAVELLE, Judge:

Contrary to his pleas, the appellant was convicted of unpremeditated murder, maiming, failure through design to properly care for a child, and larceny of military property, in violation of Articles 118, 124, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 924, and 934 (1982) [hereinafter UCMJ]. A general court-martial consisting of officer members sentenced the appellant to a dishonorable discharge, confinement for life, and reduction to Private E1. The convening authority approved the adjudged sentence.

The appellant asserts that the military judge erred: in instructing the members regarding the law of murder and "intentional refusal to act;" in admitting residual hearsay evidence without the requisite notice to the defense as required by Mil. R.Evid. 804(b)(5) [1] and without sufficient "guarantees of trustworthiness;" and, in admitting evidence of prior misconduct. The appellant also asserts that the "failure to provide proper care" specification fails to state an offense, and that that specification and the maiming specification are multiplicious for findings purposes with the murder specification. We find error only in the military judge's ruling admitting certain evidence as residual hearsay.

### I. Facts

The murder, maiming, and neglect charges involved the physical abuse and neglect of Sergeant Valdez' young daughter, Michelle. Eight years old at the time of her death, Michelle was physically abused, despised, and neglected by her stepmother, her older sister, and two step-sisters. The appellant, who also participated from time to time in the abuse, frequently turned a blind eye to the treatment of Michelle by his family and to the deteriorating physical condition of the child. His failure to intervene, to provide medical care, as well as his abusive and neglectful course of conduct are the subject of the case before us. [2]

Michelle's death came to light on the morning of 28 March 1990, when the appellant received a telephone call from his wife at about 0830 that the child was dead. The appellant, accompanied by another noncommissioned officer, rushed to the Valdez apartment, briefly attempted cardiopulminary resuscitation, and rushed the child to the emergency room. Michelle could not be revived. The appellant appeared upset but unusually unemotional when told of her death.

The government's theory of prosecution is best shown in the wording of the murder, maiming and "failure to provide proper care" specifications:

Specification: In that Staff Sergeant Ricardo Valdez, US Army, did, at Mainz–Finthen, Federal Republic of Germany, between on or about 20 March 1989 and on or about 28 March 1990, murder Michelle Valdez, his child who was under the age of 16, by beating her with various unknown objects, kicking her, deliberately failing to provide her with adequate nutrition, deliberately failing to provide her with medical attention which he knew she required for the injuries which she suffered as a result of these assaults and other medical problems from which he knew her to be suffering, to include incontinency in urination and defecation, and deliberately disregarding her need for medical care for the same, and forcing her to sleep uncovered on a mat on a cold bathroom floor, whereby, as a result of some or all of these events, alone or in combination with each other, she contracted pneumonia and septicemia

---

1. Manual for Courts–Martial, United States, 1984, Military Rule of Evidence 804(b)(5) [hereinafter Mil.R.Evid.].

2. The remaining charge, larceny of military property, concerned blank ammunition found in the appellant's apartment storage area in a search following the child's death.

and died, said death being deliberately intended.

Specification: In that Staff Sergeant Ricardo Valdez, US Army, did, at Mainz–Finthen, Federal Republic of Germany, between on or about 1 January 1990 and on or about 28 March 1990, maim Michelle Valdez, his child who was under the age of 16 years, by kicking her buttocks with his foot on several occasions, and by failing to provide her medical care for those injuries, causing thereby, loss of substantial muscle tissue.

Specification: In that Staff Sergeant Ricardo Valdez, US Army, did, at West Berlin and Mainz–Finthen, Federal Republic of Germany, between on or about 14 November 1986 and 28 March 1990, by intentional design, wrongfully fail to properly care for Michelle Valdez, his child who was five to eight years old during this period, by failing to enroll her in the appropriate level of school or provide similar instruction at home, and by failing to ensure that she was properly immunized as medically prudent and by failing to seek medical or psychiatric treatment of [sic] counseling for his daughter's medical and/or psychiatric problems, which included injuries which he knew had been inflicted upon her, and from which she was in pain and suffering, and urination and defecation incontinence, and by failing to provide proper nutrition and a healthy living environment for her, such intentional neglect under the circumstances being to the prejudice of good order and discipline in the armed forces, and/or after her death from said neglect became known to persons outside the military community, said death and neglect and news of the same being reasonably foreseeable, also being of a nature to bring discredit upon the armed forces.

3. Septicemia is the invasion and persistence of disease-producing bacteria in the bloodstream.

4. Michelle's older sister verified the accuracy of this opinion. She testified that she could hear Michelle's labored breathing from her own bedroom even though the sick child was in the bathroom with the door closed. This labored breathing was evident for two weeks before Michelle died. Further, she testified that Michelle was coughing so hard at times during the two weeks prior to her death that Michelle could not be understood when she attempted to talk.

In order to prove its case, the government presented expert testimony showing that Michelle was unusually underweight and underdeveloped for a child of her age and exhibited evidence of severe malnutrition. Medical evidence showed that the child died of septicemia[3] and staphylococcul pneumonia, and that the septicemia probably entered the child's body through a wound on her buttocks, which other evidence showed was caused by the appellant kicking the child. Other expert medical testimony showed that at the time of her death, her body exhibited numerous bruises and abrasions which occurred within ten days of her death. The pattern of bruises was characteristic of Kempe's Syndrome, better known as "battered child syndrome." The medical experts testified that Michelle must have been in much pain the final days of her life, would have devoted all of her energy to simply breathing, and her laborious breathing and general distress would have been very evident to persons nearby.[4]

According to the examining pathologist, death occurred about eight hours before the child was taken to the hospital emergency room. Other medical testimony revealed that rigor mortis was already evident as the physicians attempted unsuccessfully to resuscitate Michelle in the emergency room.

Several witnesses described Michelle as a healthy, normal child in 1984. By contrast, neighbors testified that in the eight months that the Valdez family lived near them prior to the child's death, they had seen the child only once or twice, and were not even aware that the child was part of the family and living in the Valdez family quarters. While the other Valdez children played in the neighborhood and attended school, the abused child did not. Testimony of Michelle's older sister revealed that the stepmother regularly beat Michelle with a lug-

gage strap or shoe, and permitted the children to beat and to kick her. The sister testified that the appellant was generally aware of this treatment by the stepmother, and that both parents disliked Michelle.

Two statements made by the appellant within two days after the death were admitted into evidence at trial.[5] In the first statement made to a Criminal Investigation Command (CID) investigator on the day of the child's death, the appellant described a long history of disciplinary and hygiene problems with the child and his second wife's dislike for the child. The appellant said that the child urinated and defecated on herself and was uncontrollable. At the beginning of February 1990, he found the three other Valdez children kicking the deceased and he told them to stop. A week later, he noticed that the child's buttocks was swollen. The appellant said that Michelle had a "light cough" at the time and she complained that her legs hurt. On the night of her death, the child had trouble getting up "and she could only walk by holding on and slowly." In the statement, the appellant also admitted that he had been investigated for child abuse at Fort Benning several years before. Because of the previous allegation, he was reluctant to seek medical attention for Michelle for fear of being accused of child abuse. He acknowledged that the child had not received any medical treatment or immunizations since 1984. He admitted never enrolling the child in school or teaching her at home. He denied causing any of the injuries. He said that Michelle was causing continuous friction and arguments between himself and his wife.

In his second statement made the following day, the appellant admitted that he had kicked Michelle on two occasions in January and February 1990, and that the bruise on her buttocks was caused by his kicking. Within two weeks, the appellant noticed the child's posterior was swollen and she had a hard time walking, but he did nothing about it. About 20 March, eight days be-fore her death, Michelle's defecation problems became so severe that her parents moved her into the bathroom to sleep on a blanket on the bathroom floor.[6] He also stated that most of the bruises were self-inflicted by Michelle.

The Article 32, UCMJ, testimony of the wife, admitted into evidence when she asserted her rights against self-incrimination at trial, by contrast, tended to shift the blame to the appellant. A stepsister and the sister of the dead child testified that both parents abused the child.

## II. Article 118(3), UCMJ, Murder Defined

At the outset, we emphasize that this is *not* a homicide charged under Article 118(3), murder by doing an act inherently dangerous to others, the so-called "depraved heart" murder, as in *United States v. Berg*, 30 M.J. 195 (C.M.A.), *decision adhered to on reconsideration*, 31 M.J. 38 (C.M.A.1990), and *United States v. McMonagle*, 34 M.J. 852 (A.C.M.R.1992). *See also Simpkins v. Maryland*, 88 Md.App. 607, 596 A.2d 655 (1991). *See generally* Milhizer, *Murder Without Intent*, 133 Mil. L.Rev. 205 (1991) [hereinafter Milhizer].

■ In the case before us, the appellant was charged with (and the members were instructed on) unpremeditated murder under Article 118(2); that is, unlawfully killing a human being with the intent to kill or inflict great bodily harm. Unlike "depraved heart" murder charged under Article 118(3), murder charged under Article 118(2) requires a specific intent to kill or inflict great bodily harm. Manual for Courts–Martial, United States, 1984, Part IV, para. 43b(2) [hereinafter MCM]; *United States v. Vaughn*, 49 C.M.R. 747 (C.M.A.1975); *United States v. Tilley*, 25 M.J. 20 (C.M.A.1987), *cert. denied*, 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 980 (1988). The distinction between these two forms of murder has frequently been blurred in court opinions. *See Simpkins*, 596 A.2d at 657–61 (collecting cases). *See also People v. Steinberg*, 170 A.D.2d 50, 573 N.Y.S.2d

---

5. The appellant did not testify at trial, and the defense rested without presenting any evidence.

6. Witnesses, by contrast, testified that Michelle had been moved into the bathroom as much as six weeks before her death.

965 (N.Y.A.D.1991), *aff'd,* 79 N.Y.2d 673, 584 N.Y.S.2d 770, 595 N.E.2d 845 (1992) (both opinions).[7]

■ The elements of unpremeditated murder under Article 118(2), UCMJ, are:

(a) That a certain named or described person is dead;

(b) That the death resulted from the act *or omission* of the accused;

(c) That the killing was unlawful; and;

(d) That, at the time of the killing, the accused had the intent to kill or inflict great bodily harm upon a person.

MCM, Part IV, para. 43b(2) (emphasis added).

> An unlawful killing without premeditation is also murder when the accused had either an intent to kill or inflict great bodily harm. It may be inferred that a person intends the natural and probable consequences of an act purposely done. Hence, if a person does an intentional act likely to result in death or great bodily injury, it may be inferred that death or great bodily injury was intended.

MCM, Part IV, para. 43c(3). This case either stands or falls on the question of intent to kill or inflict great bodily injury. Without that intent, there may be involuntary manslaughter or negligent homicide, but there is not murder as charged under Article 118(2).[8]

■ During oral argument, the appellate defense counsel argued that omissions of actions are not contemplated as a theory of murder under Article 118(2), UCMJ. We reject that argument. We first note that, in the case before us, the murder specification alleges a combination of affirmative assaultive acts and acts of omission. Even if the specification contained solely acts of omission, we note that the elements of the offense given in the Manual for Courts-Martial for this offense includes the phrase "or omission." MCM, Part IV, para. 43b(2)(b). We believe that omissions of actions, when there is a duty to act, are themselves acts that create criminal liability. In other words, a parent's intentional course of conduct in omitting to provide medical and other care can be sufficient for a conviction of unpremeditated murder.

■ "[T]he term 'act' itself is ambiguous, and a person failing to act when he has a duty to do so may be held to be criminally liable just as one who has acted improperly." *United States v. FMC Corporation,* 572 F.2d 902, 906 (2nd Cir.1978), citing G. Hughes, *Criminal Omissions,* 67 Yale L.J. 590 (1958). There can be no question that a parent has a duty to act under circumstances such as presented in the case before us. *United States v. Robertson,* 33 M.J. 832, 834–35 (A.C.M.R.1991); *United States v. Perez,* 15 M.J. 585, 587 (A.C.M.R.1983); *Sacks v. Thomas Jefferson University Hospital,* 684 F.Supp. 858 (E.D.Pa.1988), *aff'd,* 862 F.2d 310 (3rd Cir. 1988). A parent's deliberate failure to provide medical and other care to his or her child resulting in the death of the child can support a charge of murder. *See, e.g., Lott v. Texas,* 686 S.W.2d 304, 309 (Tex.App. 1985), *aff'd,* 770 S.W.2d 570 (Tex.Cr.App. 1986); *De Leon v. Texas,* 684 S.W.2d 778 (Tex.App.1984); *State v. Powers,* 198 Mont.

---

7. Steinberg was convicted of first degree manslaughter, which under the New York statute requires an intent to inflict serious bodily injury.

8. Involuntary manslaughter under Article 119, UCMJ, and negligent homicide under Article 134, UCMJ, are based on culpable negligence and simple negligence, respectively. MCM, Part IV, para. 44b(2) and 42b(2) and para. 85b(4); *United States v. Varraso,* 21 M.J. 129 (C.M.A. 1985), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1645, 90 L.Ed.2d 190 (1986). While these offenses involve negligent conduct, unpremeditated murder requires a specific intent to kill or inflict great bodily harm. The dividing line between manslaughter (sometimes called "negligent murder") and "malice" murder is "shadowy." Milhizer at 208 n. 18, citing Wechsler and Michael, *A Rationale for the Law of Homicide,* 37 Colum.L.Rev. 702, 721, 1937). Voluntary manslaughter, another offense under Article 119, UCMJ, is most closely related to unpremeditated murder. Both unpremeditated murder and voluntary manslaughter require an intent to kill or inflict great bodily harm. Voluntary manslaughter requires that the offense be committed in the heat of sudden passion caused by adequate provocation and the result of fear or rage, whereas unpremeditated murder does not. *Varraso,* 21 M.J. at 133; compare MCM, Part IV, para. 44c(1) with para. 42b(2) and 43c(3).

289, 645 P.2d 1357, 1362 (1982); *State v. House*, 260 Or. 138, 489 P.2d 381, 384–85 (1971). Further, acts of omission (involving deprivation of nourishment and medical care) may be found to be intentional by circumstantial evidence that is sufficient to support a conviction for murder. *Kohler v. State*, 713 S.W.2d 141 (Tex.App.1986).

### III. Instructions on "Intentional Refusal to Act."

The appellant asserts that the military judge committed plain error by instructing the members that they could return a finding of guilty to murder if they found that the decedent's death resulted from the appellant's "intentional refusal to act," and by instructing them that they could infer an intent to kill or inflict great bodily harm from the same "intentional refusal to act."

In *United States v. Alexander*, 18 M.J. 84 (C.M.A.1984), the Court of Military Appeals upheld a conviction for involuntary manslaughter under circumstances similar to but less egregious than those presented in the case before us. Similarly, this court has upheld a conviction for negligent homicide for failure to act. *See, e.g., Robertson*, 33 M.J. 832. So far as we can determine, a conviction for unpremeditated murder based largely on an intentional refusal to act is novel in the military justice system. Because of the unique nature of the offense, the instructions to the members necessarily were unique, tailored by the military judge with the active participation of the trial counsel and the defense counsel. Those instructions are the subject of this assertion of error.

The military judge instructed the members as to the second element of murder as follows:

[T]hat [the] death resulted from the act of the accused kicking her in the buttocks and or and [sic] the accused's intentional failure to take her for medical treatment, knowing that the natural and probable results of his failure to do so would necessarily result in her death or great bodily harm.

He further instructed that:

[I]t may be inferred that a person intends the natural and probable result of an act or refusal to act, purposely done. Therefore, if a person acts or intentionally refuses to act and the person knows that the natural and probable consequences to act or refusal to act is necessarily death or great bodily harm, it may be inferred that he intended to inflict death or great bodily harm....

The term "great bodily harm" means serious bodily injury or illness. Great bodily harm does not mean minor injuries such as a black eye or bloody nose or in this case minor illnesses such as a cold which is likely to improve on its own without medical intervention. It does mean, fractured or dislocated bones, deep cuts, torn parts of the body, serious damage done to internal organs or in this case, serious illnesses that will cause death or great medical [sic] harm without medical intervention.

In this case to draw the inference concerning an intentional refusal to act, you must first be convinced beyond a reasonable doubt that the accused knew his daughter was seriously ill and knew that her illness would necessarily lead to death or great bodily harm at the time that he intentionally refused to act in obtaining medical attention for her illness.

 The trial defense counsel, after initially objecting to the government's proposed instruction, participated in redrafting the instruction and agreed that the instruction as actually given was a correct statement of the law.[9] Therefore, in the ab-

---

9. Commendably, the military judge sought and received the arguments and the suggestions of opposing counsel in tailoring the instructions to the novel issues in this case. Fifty-nine pages in the record are devoted to formulating balanced instructions on findings that correctly stated the law and at the same time were not confusing to the members. After extensive and well-rea-

soned argument and much "wordsmithing," the opposing counsel were in general agreement with the military judge as to the wording of the instructions. Most importantly, the final product reflected the military judge's understanding of the law, as he is ultimately responsible for the correctness of the instruction.

sence of plain error, the failure to object to the instruction as given constitutes waiver. R.C.M. 920(f); *United States v. Smith*, 34 M.J. 200 (C.M.A.1992); *United States v. Hargrove*, 25 M.J. 68 (C.M.A.1987), *cert. denied*, 488 U.S. 826, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988); *United States v. Yanke*, 23 M.J. 144 (C.M.A.1987); *United States v. Fisher*, 21 M.J. 327 (C.M.A.1986). "Plain error" is an error that is not only obvious and substantial but also must have "had an unfair prejudicial impact on the jury's deliberations." *Fisher*, 21 M.J. at 328, citing *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985). The plain error doctrine "is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Id.*

■ We find no error in the instruction given by the military judge in this complex and novel case. He tailored the instruction to the evidence presented and gave the members correct and meaningful standards by which to measure the facts and the appellant's conduct.[10] Even if, *arguendo*, there is error, we find it did not amount to plain error, and therefore it was waived by the defense counsel's failure to object.

■ In his brief and during oral argument the appellate defense counsel argued that it was improper to instruct the members on alternate theories as to the murder: that the appellant assaulted the child with a kick that led to her death; and, that the appellant failed to provide medical care. He argued that it was impossible to tell which theory the members voted upon in adjudging the appellant guilty of unpremeditated murder. We reject that contention. We read the military judge's instruction as a whole: that the kick was part of an intentional abusive and neglectful course of conduct by a parent which caused his child's death. However, even if we assume, *arguendo*, that the disjunctive wording of the instruction provided the members with alternate theories of liability, the instruction was not erroneous. The government is entitled to proceed on alternate theories and the members are not required to agree as to a particular theory of liability in reaching the required two-thirds concurrence for a finding of guilty. *United States v. Holt*, 33 M.J. 400 (C.M.A. 1991); *United States v. Vidal*, 23 M.J. 319 (C.M.A.1987), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). *See also McMonagle*, 34 M.J. at 868 note 5 (Johnston, J., dissenting).

■ Finally, while not raised as an issue at trial or on appeal, we note that the specification of unpremeditated murder concludes with the words "... said death being deliberately intended." The specification does not include the phrase "or great bodily harm." We do not believe omission of this phrase in any way modifies or limits the intent element of Article 118(2). Rather, the specification merely recites the general elements of Article 118(2) murder. The test is not whether a specification could be made more definite and certain, but whether it contains the elements of the offense charged, enables the accused to prepare his defense, and protects him from further prosecution. *United States v. Sell*, 11 C.M.R. 202 (C.M.A. 1953); *United States v. Zaccheus*, 31 M.J. 766 (A.C.M.R.1990), *pet. denied*, 32 M.J. 380 (C.M.A.1991). It is evident from the record that all parties understood the elements of Article 118(2) murder to include "great bodily harm" as a permissible intent. Therefore, the military judge's instructions which included this phrase were proper.

## IV. Residual Hearsay

The particular statement admitted into evidence in this case was a statement made by the deceased child to her sister that the appellant's kick had caused the bruise to

---

10. Among those instructions was guidance to apply a subjective standard to the appellant's knowledge of his daughter's physical condition and to the necessary consequences of that condition. This is the standard applied by the Court of Military Appeals in *United States v.* *Berg*, an Article 118(3) case. It may be a standard more appropriate for the latter form of murder. Even assuming that this high standard was error in this case, it worked in favor of the appellant.

her buttocks. The issue arose at the end of the sister's testimony when the trial counsel asked:

Q. One final question: Who caused the bruise on Michelle's rearend?

A. My dad.

Q. How do you know that?

A. Because Michelle told me.

The defense counsel, claiming surprise, immediately objected. At an Article 39(a), UCMJ, hearing, the defense counsel moved for a mistrial and elaborated on the lack-of-notice objection and also objected to the statement itself as not qualifying as residual hearsay under Mil.R.Evid. 804(b)(5). The assistant trial counsel admitted that no notice had been provided to the defense as required by the Rule because of an oversight on his part.

Mil.R.Evid. 804(b) provides in pertinent part:

*Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness.

. . . .

(5) *Other exceptions.* A statement not specifically covered by any of the foregoing [hearsay] exceptions but having equivalent circumstantial guarantees of trustworthiness, if the military judge determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative of the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of its [sic] makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the intention to offer the statement and the

particulars of it, including the name and address of the declarant.

The military judge found that the evidence was admissible as residual hearsay under Mil.R.Evid. 804(b)(5). He found that it possessed sufficient guarantees of trustworthiness because, *inter alia*, the testimony was similar to the admissions made by the appellant, were corroborated by those admissions and by medical evidence, and were made by a witness without apparent outside influence with no apparent motive to falsify her testimony. Therefore, he permitted the testimony and denied the motion for mistrial. The military judge made no specific findings regarding requirements (A), (B), or (C) of the Rule. The military judge did find that the government failed to comply with the notice requirement, and found that the evidence was "very significant." However, the military judge found no government "bad faith" and recessed the court until the next day to give the defense time to question the witness and to formulate cross-examination questions.

 We need not determine if the military judge's remedy in granting an overnight continuance was sufficient to cure the trial counsel's failure to provide notice of his intent to introduce evidence under a residual hearsay theory. This is so because we find that the military judge erred in admitting the evidence as residual hearsay. We find that the evidence lacked the equivalent guarantees of trustworthiness required by Mil.R.Evid. 804(b)(5). Many of those circumstances enumerated by the military judge in his findings of fact were corroborative in nature. In *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the Supreme Court limited the circumstantial guarantees to the "totality of the circumstances surrounding the making of the statement" and excluded circumstances that corroborate the truth of the statements. *Id.* 110 S.Ct. at 3149.[11] Further, we are not convinced that the

11. *Idaho v. Wright* was decided 27 June 1990; the military judge's ruling occurred on 31 July 1990. While *Idaho v. Wright* involved a constitutional issue, the standard for "equivalent guarantees of trustworthiness" in Mil.R.Evid. 804(b)(5) is similar to the "indicia of reliability" required by the Sixth Amendment. *United States v. Dunlap*, 25 M.J. 89, 91 (C.M.A.1987); *United States v. Palacios*, 32 M.J. 1047, 1051 (A.C.M.R.1991).

evidence was "more probative than any other evidence" which the government could produce. However, we find the error was harmless under the circumstances because it was cumulative of the appellant's admissions in his second statement to the CID. *United States v. Grooters*, 1992 WL 117375, —— M.J. —— (A.C.M.R.1992).

### V. Uncharged Misconduct

Mil.R.Evid. 404(b) provides that:

*Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In the present case, the appellant admitted in a statement made to investigators after the death, that he had been the subject of a child abuse complaint in 1984 at Fort Benning and that he was reluctant to seek medical care for the deceased child for fear of new allegations of child abuse. The government presented the testimony of a neighbor at Fort Benning in 1984 who had seen the appellant strike the deceased's sister and had reported the incident to the military police. The witness further testified that the children were temporarily removed from the appellant's custody. Upon defense objection to this testimony, the trial counsel argued that the testimony was relevant to show the appellant's motive for not seeking medical attention. The military judge permitted the testimony on this basis, and gave the members a proper limiting instruction immediately following the testimony and again during the instructions on findings.

We hold that the evidence was properly admitted under Mil.R.Evid. 404(b) for the limited purpose of showing the appellant's motive and intent in not seeking medical treatment. *United States v. Spata*, 34 M.J. 284 (C.M.A.1992); *United States v. Brooks*, 22 M.J. 441, 444 (C.M.A.1986). We find the evidence was relevant, probative and not unduly prejudicial, and that the military judge properly instructed the members, twice, on the limited uses they could make of the evidence. We find this assignment of error to be without merit.

### VI. Sufficiency of the Neglect Specification.

The specification alleging failure to provide proper care in violation of Article 134, UCMJ, is set out earlier in this opinion.

The appellant cites *United States v. Wallace*, 33 M.J. 561 (A.C.M.R.1991), in which this court held that, in the absence of a statute or a punitive regulatory provision, this court would "decline to enter the morass which would be created by holding that child neglect, standing alone, constitutes an offense under Article 134, UCMJ. We believe that conduct which results in injury to children can be charged under existing punitive provisions of the Uniform Code of Military Justice." This court cited *Alexander*, 18 M.J. 84, as an example of how child neglect could be charged under existing provisions of the UCMJ. In *Alexander*, the accused was found guilty of involuntary manslaughter resulting from bronchial pneumonia induced by neglect.

We will follow the precedent of this court and dismiss this particular charge. Because of the military judge's ruling that this charge was multiplicious for sentencing with murder, we find that the appellant has suffered no harm from the members considering this specification.

### VII. Multiplicity

The appellant asserts that the maiming (Article 124) and "failure to provide proper care" (Article 134) offenses are multiplicious for findings with murder. The military judge ruled that the maiming and the murder specifications were multiplicious for sentencing but not findings, and that the "failure to provide proper care" and murder specifications were not multiplicious for either findings or sentencing.

Regarding the murder and the "failure to provide proper care" offenses, we need not decide this issue because of our action in dismissing the "failure to provide" specification.

Regarding the maiming and murder offenses, we agree with the military judge. The specifications contain different inclusive dates, and the wording of the two specifications is sufficiently discrete so that they are not multiplicious for findings purposes. *United States v. Holt*, 16 M.J. 393 (C.M.A.1983); *United States v. Baker*, 14 M.J. 361 (C.M.A.1983). We conclude that the military judge was correct in finding the offenses multiplicious only for sentencing purposes. *United States v. Goins*, 40 C.M.R. 107 (C.M.A.1969).

Finally, we find that the evidence as a matter of law and fact is sufficient to support the members' finding of guilt beyond a reasonable doubt as to the murder, maiming, and larceny offenses. We have reviewed the issues personally raised by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

The findings of guilty of Charge IV and its Specification are set aside and Charge IV and its Specification are dismissed. The remaining findings of guilty and the sentence are affirmed.

Senior Judge JOHNSON and Judge WERNER concur.