UNITED STATES, Appellee

v.

**Ricardo VALDEZ, Staff Sergeant U.S. Army, Appellant.**

No. 93–0120.
CMR No. 9002264.

U.S. Court of Military Appeals.

Argued Dec. 3, 1993.

Decided Sept. 23, 1994.

For Appellant: *William J. Holmes* (argued); *Captain Clement B. Lewis, III* (on brief).

For Appellee: *Major Joseph C. Swetnam* (argued); *Lieutenant Colonel Thomas E. Booth* and *Major James L. Pohl* (on brief); *Major Donna L. Barlett.*

*Opinion of the Court*

COX, Judge:

Appellant stands convicted, contrary to his pleas, of unpremeditated murder, larceny, and maiming, in violation of Articles 118(2), 121, and 124, Uniform Code of Military Justice, 10 USC §§ 918(2), 921, and 924, respectively. His approved sentence extends to a dishonorable discharge, confinement for life, and reduction to Private E–1. The Court of Military Review affirmed these results. *See* 35 MJ 555 (1992). We granted review of three issues. The first relates both to the murder and the maiming charges and questions whether an item of erroneously received hearsay evidence prejudiced appellant. The second challenges the sufficiency of evidence of murder and maiming. The third questions the correctness of the military judge's instructions on unpremeditated murder. 38 MJ 225 (1993). Taking these issues out of order, we resolve each of them against appellant, and we affirm.

Regarding the correctness of the military judge's instructions on murder and the sufficiency of evidence of murder, appellant's contention primarily is that his conviction cannot be based, in whole or in part, on his "omissions," here his failure to seek free medical attention for his obviously deteriorating child. In so arguing, appellant takes on a firmly-established principle of Anglo–American law. Before discussing the law, however, a solid basis in fact is necessary.

The Court of Military Review partially summarized the evidence of record, as follows:

The murder, maiming, and neglect[1] charges involved the physical abuse and neglect of Sergeant Valdez' young daughter, Michelle. Eight years old at the time of her death, Michelle was physically abused, despised, and neglected by her stepmother, her older sister, and two stepsisters. The appellant, who also participated from time to time in the abuse, frequently turned a blind eye to the treatment of Michelle by his family and to the deteriorating physical condition of the child. His failure to intervene, to provide medical care, as well as his abusive and neglectful course of conduct are the subject of the case before us.*

Michelle's death came to light on the morning of 28 March 1990, when the appellant received a telephone call from his wife at about 0830 that the child was dead. The appellant, accompanied by another noncommissioned officer, rushed to the Valdez apartment, briefly attempted cardiopulmonary resuscitation, and rushed the child to the emergency room. Michelle could not be revived. The appellant appeared upset but unusually unemotional when told of her death.

The government's theory of prosecution is best shown in the wording of the murder, maiming and "failure to provide care" specifications:

> Specification: In that Staff Sergeant Ricardo Valdez, U.S. Army, did, at Mainz–Finthen, Federal Republic of Germany, between on or about 20 March 1989 and on or about 28 March 1990, murder Michelle Valdez, his child who was under the age of 16, by beating her with various unknown objects, kicking her, deliberately failing to provide her with adequate nutrition, deliberately failing to provide her with medical attention which he knew she required for the injuries which she suffered as a result of these assaults and other medical problems

from which he knew her to be suffering, to include incontinency in urination and defecation, and deliberately disregarding her need for medical care for the same, and forcing her to sleep uncovered on a mat on a cold bathroom floor, whereby, as a result of some or all of these events, alone or in combination with each other, she contracted pneumonia and septicemia and died, said death being deliberately intended.

> Specification: In that Staff Sergeant Ricardo Valdez, US Army, did, at Mainz–Finthen, Federal Republic of Germany, between on or about 1 January 1990 and on or about 28 March 1990, maim Michelle Valdez, his child who was under the age of 16 years, by kicking her buttocks with his foot on several occasions, and by failing to provide her medical care for those injuries, causing thereby, loss of substantial muscle tissue.

> [Wrongful failure to provide care specification omitted. See n. 1]

In order to prove its case, the government presented expert testimony showing that Michelle was unusually underweight and underdeveloped for a child of her age and exhibited evidence of severe malnutrition. Medical evidence showed that the child died of septicemia ** and staphylococcul pneumonia, and that the septicemia probably entered the child's body through a wound on her buttocks, which other evidence showed was caused by the appellant kicking the child. Other expert medical testimony showed that at the time of her death, her body exhibited numerous bruises and abrasions which occurred within ten days of her death. The pattern of bruises was characteristic of Kempe's Syndrome, better known a "battered child syndrome." The medical experts testified that Michelle must have been in much pain the final days of her life, would have devoted all of her

---

1. The Court of Military Review dismissed the neglect charge brought under Article 134, Uniform Code of Military Justice, 10 USC § 934, on the ground that the conduct alleged should have been "charged under existing punitive provisions of the" UCMJ. 35 MJ at 555, 564 (1992), *quoting United States v. Wallace,* 33 MJ 561, 564 (ACMR 1991). We note that, in consolidating specifications under this Charge, the military judge dismissed the two remaining specifications. Specifications which are consolidated are not dismissed. *United States v. Sorrell,* 23 MJ 122 n. 1 (CMA 1986).

energy to simply breathing, and her laborious breathing and general distress would have been very evident to persons nearby.***

According to the examining pathologist, death occurred about eight hours before the child was taken to the hospital emergency room. Other medical testimony revealed that rigor mortis was already evident as the physicians attempted unsuccessfully to resuscitate Michelle in the emergency room.

Several witnesses described Michelle as a healthy, normal child in 1984. By contrast, neighbors testified that in the eight months that the Valdez family lived near them prior to the child's death, they had seen the child only once or twice, and were not even aware that the child was part of the family and living in the Valdez family quarters. While the other Valdez children played in the neighborhood and attended school, the abused child did not. Testimony of Michelle's older sister revealed that the stepmother regularly beat Michelle with a luggage strap or shoe, and permitted the children to beat and to kick her. The sister testified that the appellant was generally aware of this treatment by the stepmother, and that both parents disliked Michelle.

Two statements made by the appellant within two days after the death were admitted into evidence at trial.**** In the first statement made to a Criminal Investigation Command (CID) investigator on the day of the child's death, the appellant described a long history of disciplinary and hygiene problems with the child and his second wife's dislike for the child. The appellant said that the child urinated and defecated on herself and was uncontrollable. At the beginning of February 1990, he found the three other Valdez children kicking the deceased and he told them to stop. A week later, he noticed that the child's buttocks was swollen. The appellant said that Michelle had a "light cough" at the time and she complained that her legs hurt. On the night of her death, the child had trouble getting up "and she could only walk by holding on and slowly." In the statement, the appellant also admitted that he had been investigated for child abuse at Fort Benning several years before. Because of the previous allegation, he was reluctant to seek medical attention for Michelle for fear of being accused of child abuse. He acknowledged that the child had not received any medical treatment or immunizations since 1984. He admitted never enrolling the child in school or teaching her at home. He denied causing any of the injuries. He said that Michelle was causing continuous friction and arguments between himself and his wife.

In his second statement made the following day, the appellant admitted that he had kicked Michelle on two occasions in January and February 1990, and that the bruise on her buttocks was caused by his kicking. Within two weeks, the appellant noticed the child's posterior was swollen and she had a hard time walking, but he did nothing about it. About 20 March, eight days before her death, Michelle's defecation problems became so severe that her parents moved her into the bathroom to sleep on a blanket on the bathroom floor.*.*** He also stated that most of the bruises were self-inflicted by Michelle.

The Article 32, UCMJ, testimony of the wife, admitted into evidence when she asserted her rights against self-incrimination at trial, by contrast, tended to shift the blame to the appellant. A stepsister and the sister of the dead child testified that both parents abused the child.

---

*The remaining charge, larceny of military property, concerned blank ammunition found in the appellant's apartment storage area in a search following the child's death.

** Septicemia is the invasion and persistence of disease-producing bacteria in the bloodstream.

*** Michelle's older sister verified ... that she could hear Michelle's labored breathing from her own bedroom even though the sick child was in the bathroom with the door closed. This labored breathing was evident for two weeks before Michelle died. Further, she testified that Michelle was coughing so hard at times during the two weeks prior to her death that Michelle

could not be understood when she attempted to talk.

**\*\*\*\*** The appellant did not testify at trial, and the defense rested without presenting any evidence.

**\*\*\*\*\*** Witnesses, by contrast, testified that Michelle had been moved into the bathroom as much as six weeks before her death.

35 MJ at 557–59.

When the military judge instructed the members on murder, he considerably narrowed the range of the prosecution's theory from that alleged in the specification, apparently based on the medical testimony regarding the cause(s) of death. (*See* specification quoted at (3).) Regarding causation, the judge instructed the members that it was an essential element or fact

> that her [Michelle's] death resulted from the act of the accused kicking her in the buttocks and or and [*sic*] *the accused's intentional failure to take her for medical treatment,* knowing that the natural and probable results of his failure to do so would necessarily result in her death or great bodily harm[.]

(Emphasis added.)

Regarding intent, the judge instructed:

The intent to kill or inflict great bodily harm may be proved by circumstantial evidence—that is, by facts and circumstances from which you may reasonably infer the existence of such an intent. Thus, it may be inferred that a person intends the natural and probable result of an act or refusal to act, purposely done. Therefore, if a person acts *or intentionally refuses to act* and the person knows that the natural and probable consequences to act or refusal [sic] to act is necessarily death or great bodily harm, it may be inferred that he intended to inflict great bodily harm. The drawing of this inference is not required.

\*　　\*　　\*

In this case to draw the inference concerning *an intentional refusal to act,* you must first be convinced beyond a reasonable doubt that the accused knew his daughter was seriously ill and knew that her illness would necessarily lead to death or great bodily harm at the time that he

*intentionally refused to act* in obtaining medical attention for her illness.

(Emphasis added.)

Article 118 provides:

Any person subject to this chapter who, without justification or excuse, unlawfully *kills* a human being, when he—

\*　　\*　　\*

(2) intends to kill or inflict great bodily harm;

\*　　\*　　\*

is guilty of murder, and shall suffer such punishment as a court-martial may direct....

(Emphasis added.) The Uniform Code itself does not further specify the nature of the conduct that might constitute a killing. Article 118(2) is essentially unchanged from its original enactment in 1950. *See* 64 Stat. 140.

Paragraph 43b(2), Part IV, Manual for Courts–Martial, United States, 1984, sets forth the elements of unpremeditated murder as follows:

(a) That a certain named or described person is dead;

(b) That the death resulted *from the act or omission* of the accused;

(c) That the killing was unlawful; and

(d) That, at the time of the killing, the accused had the intent to kill or inflict great bodily harm upon a person.

(Emphasis added.)

The Manual for Courts–Martial which accompanied the UCMJ also contemplated omissions as a means of killing. Paragraph 197*a*, Manual for Courts–Martial, United States, 1951, in the general discussion of murder, states: "The offense is committed at the place of *the act or omission* although the victim may have died elsewhere." (Emphasis added.) Paragraph 197*e*, discussing intent, states: "It is sufficient that it [intent] existed at the time of *the act or omission.* ..." (Emphasis added.) The causal element of murder is stated as: "(b) that his death resulted from *the act or omission* of the accused...." Para. 197, *"Proof"* (emphasis added).

Article 118 succeeded Article of War (AW) 92, *reprinted in* Manual for Courts–Martial, U.S. Army, 1928 at 223, and Article 6, Articles for the Government of the Navy, *reprinted in* Naval Courts and Boards, 1937 at 457. *See* Legal and Legislative Basis, Manual for Courts–Martial, United States, 1951, at 268–70. Without further description, AW 92 denounced "murder," and Article 6, AGN denounced "the crime of murder."

The 1928 Manual, *supra,* defined "murder" in AW 92 as "the unlawful killing of a human being with malice aforethought." "Malice aforethought," according to the Manual,

> may exist when the act is unpremeditated. It may mean any one or more of the following states of mind preceding or coexisting with *the act or omission by which death is caused:* An intention to cause the death of, or grievous bodily harm to, any person, whether such person is the person actually killed or not....

Para. 148, 1928 Manual, *supra* at 162, 163 (emphasis added).

The 1937 Naval Courts and Boards similarly defined "murder" in Article 6, AGN, as "the unlawful killing of a human being with malice aforethought...." Para. 53 at 22 (footnote omitted). In addition, the text notes: "The death must take place within a year and a day of *the act or omission* that caused it, and the offense is committed at the place of *such act or omission* although the victim may have died elsewhere." Para. 53 at 23.

LaFave and Scott state the general rule that "[m]ost crimes are committed by affirmative action rather than by non-action." W. LaFave and A. Scott, *Substantive Criminal Law* § 3.3 at 282 (1986). However, as the authors note:

> The common law imposes affirmative duties upon persons standing in certain personal relationships to other persons— upon parents to aid their small children.... Thus a parent may be guilty of criminal homicide for failure to call a doctor for his sick child.... Action may be required to thwart the threatened perils of nature (e.g., to combat sickness, to ward off starvation or the elements)....

*Id.* at § 3.3(a)(1) at 284–85 (footnotes omitted). The notion that parents can be criminally responsible for murdering their children by failing to provide the necessities of life is well established. *See* R. Perkins and R. Boyce, *Criminal Law* 658–68 (3d ed. 1982); *Wharton's Criminal Law* 284–87 (C. Torcia 14th ed. 1979); 2 J. Bishop, *A Treatise on Criminal Law* § 660.1 at 501 (9th ed. 1923); 1 W. Russell, *A Treatise on Crimes and Misdemeanors* 487–88 (1845). *Cf. United States v. Miller,* 37 MJ 133, 137–38 (CMA 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 705, 126 L.Ed.2d 671 (1994).

■ In the instant case, the Government alleged and proved that appellant killed Michelle through some combination of action and inaction. Nothing in the Uniform Code of Military Justice or its legislative history suggests that, in 1950, Congress intended to change the law and abandon the long-standing duty of parents to protect and care for their children. In particular, nothing suggests a congressional intent to shield parents from criminal accountability for killing their helpless children, in whole or in part, by the withholding of vital medical attention.

Given the overwhelming pathologic evidence of the victim's appalling physical condition in the weeks and months preceding her death—a glance at the *post-mortem* photographs depicting the child's bruised, battered, and emaciated body compellingly tells the story—the military judge did not err in instructing the court members that a calculated withholding of medical attention, alone or in combination with physical abuse, plus a specific intent to inflict great bodily harm or to cause death, stated the essence of unpremeditated murder. Thus we hold that the third issue, attacking the correctness of the military judge's instructions, is without merit.

■ We backtrack now to the first issue, which addresses the prejudicial effect, if any, of an item of erroneously received hearsay evidence. One of the prosecution's witnesses was Nelleke Valdez, appellant's daughter by his first marriage and Michelle's full sister. Nelleke (like her stepsister, Charlene) provided a staggering amount of direct, eyewit-

ness testimony detailing the appalling physical and emotional abuse heaped on the deceased by both appellant and his second wife, Christina.[2]

At the conclusion of Nelleke's otherwise unobjectionable testimony on direct examination, the following bit of hearsay evidence was introduced:

Q. One final question: Who caused the bruise on Michelle's rearend?

A. My dad.

Q. How do you know that?

A. Because Michelle told me.

Appellant immediately objected based on the rule against hearsay.

The significance of this testimony is that this particular wound—described as a "large organizing hematoma and abscess"—was the injury alleged in the maiming charge. It was also tendered as the product of that kicking which was alleged as one of causative factors of Michelle's death. Other than a bed sore caused by her inability to vary her sleeping position (due to the injury), there was no other significant injury to her buttocks. Since there was considerable evidence that both appellant and Christina inflicted unimaginable physical abuse upon Michelle, the question of which of them delivered this particular injury was highly significant.

Ultimately, after conducting a session under Article 39(a), UCMJ, 10 USC § 839(a), the military judge received the evidence as residual hearsay (Mil.R.Evid. 804(b)(5), 1984 Manual, *supra* ) in part, apparently, on a near-statement-against-interest theory.[3] The Court of Military Review, however, cit-

ing *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), concluded that the military judge erred in receiving the evidence since "[m]any of those [other] circumstances enumerated by the military judge in his findings of fact were corroborative in nature," and thus in violation of the Confrontation Clause. 35 MJ at 563; *cf. United States v. McGrath,* 39 MJ 158 (CMA 1994). Nevertheless, the Court of Military Review found the erroneous receipt of evidence "harmless under the circumstances because it was cumulative of the appellant's admissions in his second statement to the CID." 35 MJ at 564.

In that second statement, appellant was asked, "How did Michelle get the bruise on her butt?" Appellant responded, "It was from me kicking her with my foot, the end of Jan or the beginning of Feb 90." As indicated, there was only one bruise on Michelle's "butt"—only one injury the CID and appellant could have been referring to. We agree with the Court of Military Review that Nelleke's repetition of what Michelle told her was not significant here.

The final issue asks whether the evidence of murder and maiming was legally sufficient. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). It was.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges CRAWFORD, GIERKE, and WISS concur.

---

**2.** Christina Valdez was a German national, and the crimes were committed on German soil. This Court has no cognizance of what, if any, proceedings were instituted or results obtained against Christina Valdez by appropriate civil authorities.

**3.** Nelleke testified that Michelle regretted telling Nelleke that appellant had caused the bruise,

because Michelle was afraid Nelleke would repeat the statement to appellant or Christina [and, inferentially, Michelle would receive further punishment]. Among the factors the military judge took into consideration in determining the statement to be reliable was the victim's "absence of any motive ... to falsely identify" appellant as the perpetrator.