UNITED STATES, Appellee

v.

HETZEL K. RIGGLEMAN, Corporal, U. S. Army, Appellant

1 USCMA 336, 3 CMR 70

No. 195

Decided April 23, 1952

Lt. Col. George E. Mickel, U. S. Army, for Appellant.

Lt. Col. Paul J. Leahy, U. S. Army, and 1st Lt. Richard L. Brown, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

Petitioner was tried by general court-martial for manslaughter in violation of Article of War 93, 10 USC § 1565. The charge and specification were that the petitioner at Verdun, France, feloniously and unlawfully killed Umberto Patti, by running into him with a motor vehicle. After a trial on the merits, the court found petitioner guilty as charged and sentenced him to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined for the period

336

of 2 years. The reviewing authority approved only so much of the sentence as provided for a dishonorable discharge, total forfeitures, and confinement at hard labor for one year. However, he suspended the execution of the dishonorable discharge until a future date. The board of review in the office of The Judge Advocate General of the Army approved the findings and sentence as reduced. The accused then petitioned this Court for a review, which we granted, limiting the issue to whether there is substantial evidence to support the finding of guilty.

The facts out of which this unfortunate death occurred are these: On the evening of March 31, 1951, the accused had been doing considerable drinking. He was awakened on the morning of April 1st and instructed to drive to Metz, France, and assist one Corporal Esquival in returning a disabled tractor and trailer to Verdun. Accompanied by Private First Class Williams, the accused departed at approximately 10 o'clock A. M., and arrived at Metz an hour and 45 minutes later. He did not immediately find Corporal Esquival, but noticed the tractor and trailer in a motor pool. He and Williams attempted to start the motor, but they were unsuccessful. However, by using a tow rope they removed the trailer from the tractor and towed the tractor around the area until the motor started. The air pressure in the braking system was down and it took some little time after the motor was started to build it up to the operating pressure. Private Esquival was subsequently located and the parties planned the journey home.

Several hours later the accused, driving his own tractor, left Metz for the return trip. He was followed by Corporal Esquival who drove the crippled vehicle. On the outskirts of town the motor stalled and the petitioner used his vehicle to push the faulty tractor until the motor again started running. Several miles farther along the road the motor again stopped. Petitioner then took over driving the disabled vehicle accompanied by Corporal Esquival, and Williams drove the other one. While driving petitioner noticed that when he blew the horn or turned on the headlights the motor stalled. Between Metz and a town identified as Etain the faulty vehicle caused considerable trouble and it was again necessary to push it to get the motor started. Time was taken out at Etain for lunch, and petitioner consumed two bottles of beer. The trip homeward was again started and the parties arrived about 2 miles beyond Etain when they were again required to push the tractor. Once again the petitioner took over the driving of the defective vehicle. Some distance beyond Etain they encountered a grade and the motor again stalled. It was noticed at this point that the generator was not charging and Williams, who came over to talk to the accused heard the low pressure warning signal and noticed the air pressure in the brake system was reduced to a dangerous level. As the vehicle continued on up the grade the motor again started causing difficulty, so upon reaching the crest of a hill the accused took the car out of gear and started to coast down-hill, hoping to go as far as possible before encountering further difficulty. The hill was between 1,000 and 1,200 feet from the crest to the bottom and the accused noticed a bus coming from the opposite direction and approaching the curve at the base. He concluded that at the respective speeds he would meet the bus on the curve near the bottom of the hill. About half way between the crest and the curve accused claims to have put the tractor into fifth gear, pushed on the brake pedal, and found there was insufficient air pressure to permit the brakes to operate efficiently. He, nevertheless, took no further action to retard the speed of the vehicle and just before it came abreast of him he saw the deceased riding a bicycle on the right-hand side of the road approximately 50 feet ahead of him. The road was wet and he concluded not to apply the hand brake because of the slippery surface and the probability of skidding into the bus. Rather, he chose to cut to the left rapidly as he cleared the bus and pass between it and the deceased. As soon as the bus had cleared he swerved to the left, but was unable to get far

enough over to miss hitting the deceased. The right front portion of the truck collided with the bicycle, deceased was critically injured, and shortly thereafter died. After the impact the accused headed the tractor back to the right-hand side of the road, put on the hand brake, skidded into a tree and travelled some additional distance. The truck came to rest 558 feet from the point of impact. The highway had a maximum speed limit of 25 miles per hour, and the accused estimated he was travelling between 30 and 35 miles per hour just prior to the time of the accident which happened at approximately 5:30 P. M.

Some additional facts which are relevant to the problem involved are these: The accused had driven similar tractors for 6 or 7 years; he was familiar with their operation and braking system; he knew the brakes were operated by air pressure and that the running of the motor was necessary to maintain the proper amount of air in the system, or to raise it if the pressure had been reduced. There was a warning buzzer on the dashboard of the tractor to indicate when the air pressure had reached an unsafe level and while the vehicle was stopped some little distance short of the crest of the hill, the buzzer had sounded, indicating a low pressure. Shortly after passing over the crest of the hill, and while at least 300 feet from the curve at the bottom, the buzzer sounded again, warning of low pressure. As the tractor free-wheeled down the slope and approached the curve accused did not use the hand brake to slow down the vehicle; he did not honk the horn to warn the bicycle rider of the presence of the oncoming tractor; and his sole effort to avoid the collision was to attempt to squeeze between the rear of the bus and the deceased.

An expert witness was called who testified as to the mechanical operations of the motor and tractor. He further testified that if the vehicle was in neutral it was impossible to shift into gear with the vehicle moving and the engine dead. He likewise testified that Army Regulations prohibit coasting down a grade with the car out of gear and this regulation was admittedly known by the accused.

A map of the scene, showing the point of the impact, degree of the curve, the direction and width of the road, the position of the bicycle rider, and the final stopping place of the truck was introduced into evidence. In addition, there were photographs showing the nature and surface of the highway and the physical characteristics of the surrounding area. The road was 33.78 feet wide, the slope of the hill was 8 degrees and from the exhibits it was apparent that the bicycle rider should have been clearly visible to the accused from the crest of the hill to the point of impact, although the accused states he did not see him until he was approximately 50 feet away and too late to avoid the collision.

An officer reported at the scene of the accident shortly after the collision and apparently noticed the odor of alcohol on the breath of the accused. He directed him to an Army dispensary and at about 6:30 o'clock that evening a blood test was made. The laboratory report disclosed the presence of alcohol in his system and, based on the level, the doctor testified that the accused had been drinking within 8 hours from the time of the report. In addition, he testified to the odor of alcohol on the breath, but stated that in his opinion the faculties of the accused were not materially impaired by the drinking.

The record discloses that with the tractor in two-wheel drive the hand brake would bring the vehicle to a stop in the distance of 196 feet and in four-wheel drive within a distance of 108 feet, if the vehicle were travelling at a speed of 35 miles per hour; and that when going down an 8 degree slope at that speed the hand brake was sufficiently efficient to bring the tractor to a stop and that the locking power of the hand brake was sufficient to lock the rear wheels.

Before pointing out why we believe the quoted evidence is not insufficient to sustain the findings as a matter of law, we desire to discuss the general principles involved. Homicides caused by

the operation of motor vehicles present difficult propositions of law. There are many regulations governing the operation of motor vehicles, the infraction of which may constitute negligence, but not all of which would constitute the foundation for a conviction of involuntary manslaughter. The following quotation from Mr. Justice Wolfe's opinion in State v. Lingman, 91 Utah 180, 91 P2d 457, aptly points up the difficulty in determining the line of demarcation between the violations which will sustain a verdict of involuntary manslaughter, and those which will not:

"Infractions of rules of traffic may run the gamut from mere inadvertence or slight omissions to 'any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life', which is first degree murder. . . . Concretely illustrated, the gamut of infractions of the traffic laws may range from all but completely stopping at a stop sign before entering a sparsely travelled portion of an arterial highway, to a drunken driver's madly careening down a traffic-laden street. Death from the former would only give rise to a civil action; from the latter perhaps a charge of murder. Where is the line at which the infraction becomes more than civil negligence, that is, criminal negligence? It is not possible to draw it mathematically. The accordion words like 'mere negligence' and 'gross negligence' or 'wanton negligence' suggest comparisons only and give no absolute rule for guidance. We think the 'unlawful act', that is, the infraction, must be done in such a manner as to more than constitute a mere thoughtless omission or slight deviation from the norm of prudent conduct. It must be reckless or in marked disregard for the safety of others. When it does that, it passes the stage of mere malum prohibitum and approaches the unsocial aspects of malum in se. And the spirit of the person while committing the infraction is not a test. A truck driver seriously bent on meeting a schedule of his rounds who shoots through an intersection as if he were driving the only car extant, is just as guilty of reckless conduct as the driver of a car full of revelers joyously celebrating a football victory."

Paragraph 180a, Manual for Courts-Martial, U. S. Army, 1949, recognizes the various degrees of negligence and prescribes the base used in the military for the offense as culpable negligence. That section provides, in part:

"Involuntary manslaughter is homicide unintentionally caused in the commission of an unlawful act not inherently dangerous to human life, or by culpable negligence in performing a lawful act or an act required by law. In involuntary manslaughter in the commission of an unlawful act, the unlawful act must be evil in itself by reason of its inherent nature and not an act which is wrong only because it is forbidden by a statute or order. Thus, the driving of an automobile in slight excess of a speed limit duly fixed, but not recklessly or in a culpably negligent manner, is not the kind of unlawful act contemplated."

Culpable negligence is higher in magnitude than simple inadvertence, but falls short of intentional wrong. It is defined in the 1949 Manual, paragraph 180a, as

". . . a degree of carelessness greater than simple negligence and may be described as a negligent act or omission accompanied by a disregard for the foreseeable consequences to others of such act or omission."

Previously decided board of review cases have used the expression "reckless or wanton, showing a disregard of human safety." See CM 319823, United States v. Rhimes, 69 BR 123, 125; CM 322047, United States v. Porter, 71 BR 7, 15; CM 344684, United States v. Mosier, 10 BR JC 309, 315; ACM 1064, United States v. Chauvin, 1 CMR 286, 288.

To develop further the previous service rule, which we believe sets forth appropriate principles, we quote from the case of United States v. Tucker, CM 341061, 7 BR JC 33, 40. In that case the opinion of the Judicial Council con-

tains the following language, (quoting from United States v. Childs, 57 BR 113, 118):

" 'The degree of negligence necessary to be shown in a prosecution for involuntary manslaughter, based upon an unintentional killing by a motor vehicle, is more than is required on the trial of an issue of negligence in a civil action. The general rule is that negligence, to become criminal, must necessarily be reckless or wanton and of such a character as to show an utter disregard for the safety of others under circumstances likely to cause injuries.' (Blashfield, Cyclopedia of Automobile Law and Practice, Vol. 8, pp. 108–109).

" 'At common law, one causing death by negligent driving is not criminally responsible unless the negligence is so great that the law imputes a criminal intent. A motor vehicle is not a deadly or inherently dangerous instrumentality, so as to impose liability for mere carelessness in its use or operation, and the degree of negligence necessary to support a conviction is such recklessness or carelessness as is incompatible with a proper regard for human life. *It is sufficient, however, if it reasonably appears that death or great bodily harm was likely to result from the driver's conduct.*' (Sec. 1380, 42 C.J., pp. 1356–1357). (Italics supplied.)"

It is obvious then, in line with these authorities, that if in the instant case there is only a slight deviation from the norm of prudent conduct the finding must fall. On the other hand, if the negligent acts of the accused reached a magnitude from which the court could conclude there was a reckless or wanton disregard for the safety of others, then we must affirm.

As we unfold the panorama of facts in this case, we do not find an isolated infraction of a traffic rule; rather, we find an accumulation of careless and imprudent acts which, when totalled together, permit the triers of fact to find a wanton and reckless disregard of the safety of other travellers rightfully on the highway. Deceased was riding a bicycle on his proper side of the road and there is no suggestion that he in any way contributed to his death. The accident happened during daylight hours, the highway from the crest of the hill to the curve where the deceased was struck was straight, and there were no obstructions which would conceal him from the view of the accused. The bus, travelling in the opposite direction, was on the far side of the deceased until just before the impact. The testimony, the physical evidence, and such inferences as may be drawn from the position of the deceased and his apparent lack of seeing the oncoming vehicle clearly establish that he was travelling in the same direction as the tractor. This, together with the nature and degree of the curve, would establish that the relative positions of the three vehicles would be such that the bus would not cut across the line of sight from the tractor to the bicycle at any time before impact. Without any apparent justification or reason the accused did not see the deceased until the two vehicles were so close that a collision was inevitable. Clearly, the evidence discloses that accused failed to keep any lookout, in spite of the fact that he was driving a tractor in such a mechanical condition that extraordinary care should have been exercised and he should have been particularly alert to discover the presence of other persons or vehicles in his path.

The second imprudent act was the failure to sound a warning. The deceased was on a bicycle, which is easily maneuverable, and had a warning been sounded, a quick turn to the right shoulder by him might have avoided the collision. While it was shown that if the horn had been sounded the motor would have been shorted out, this is no excuse for the failure to use it as the motor was not running. If it be argued that because of low pressure or a dead battery the horn would not sound, this adds up to another indifferent act, particularly when coupled with the fact that the tractor had defective brakes. To drive a vehicle so impaired on a main-travelled thoroughfare, with no warning device, is more than a devia-

340

tion from the norm of reasonable persons.

There can be little question about disregard for the safety of others in driving a vehicle along a principal highway with sharp descents without adequate brakes. Here, the accused had been over the road and was experienced in driving this particular type of vehicle. He must have known of the probability that he would be unable to control the movement of the tractor by the use of the foot brakes. Its mechanical behavior as it was being driven between Metz and the crest of the hill disclosed that the air pressure reached a dangerous level when the motor was not running. The buzzer had warned of insufficient pressure at least once; and, while the level may have been increased when the motor was running, the continual stopping of the vehicle and the idleness of the motor would have a tendency to reduce the pressure. Without checking the power of the brakes to stop or slow down the vehicle, the accused started down a rather steep descent, knowing there was oncoming traffic; again, a rather reckless disregard for his own safety and the safety of others who might be on the road.

When the defective brakes are considered in connection with the next infraction, the picture of recklessness becomes more clear. With knowledge of impaired braking facilities, the accused literally threw away a mandatory safety precaution. Army Regulations prohibit coasting down slopes out of gear and ordinary driving experience teaches the folly of such an act. The retarding effect of the motor's operation is cast aside, and the vehicle turned loose to move at an uncontrolled speed. If, with good brakes it is imprudent not to leave the vehicle in gear, then without them it is foolhardy. In discussing this infraction we do not overlook the testimony of the accused to the effect that he shifted into gear after starting down the grade. However, the testimony that it is impossible to mesh the gears under those circumstances suggests the improbability of his having done so.

It can be assumed, as stated in the Manual, that merely exceeding a speed law is not a sufficient predicate to sustain a conviction for involuntary manslaughter; but, there are circumstances under which such a violation will reach the magnitude of culpable negligence. It may only be a slight departure from the norm of human behavior to exceed the speed limit secure in the belief that the vehicle is equipped with good brakes so that it can be controlled reasonably. However, excessive speed becomes more than that when the ordinary mechanical means of stopping the car are not present. We believe the violation of the speed laws in this instance lifts the infraction above simple negligence.

An additional element to establish recklessness is the failure of the accused to use the only remaining means he had to retard the speed of the vehicle as it gained momentum going down the hill. He knew he would meet a bus on the curve, that the road was wet, and skidding possible. He permitted the tractor to continue to gain speed for a distance of from 600 to 900 feet and when he was at least 300 feet away from the curve he was aware that the hand brake only would effectively slow down the speed of the vehicle. The evidence discloses an application would have positively slowed down the forward movement. Yet, no attempt of any kind was made by the accused to use this method as he rolled forward. His reason for not using the hand brake was that he was concerned about slipping into the bus or over the shoulder of the turn, but he had not used it prior to the time he need fear that result. While we do not infer that it was negligence because the accused did not use the best method to avoid the collision after the emergency presented itself, what we do hold is that he was reckless for failing to slow down the vehicle to prevent the emergency from arising when he had the means to do so.

We are satisfied that any fair minded person could conclude the accused was guilty of culpable negligence and that in keeping with the foregoing analysis there was sufficient evidence before the court to permit the members to find his conduct was reckless and in wanton disregard of the rights of the deceased.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.