UNITED STATES, Appellee

v

JOSEPH J. CAPLINGER, Sergeant, U. S. Army, Appellant

20 USCMA 306, 43 CMR 146

No. 23,204

January 29, 1971

*Captain Francis X. Gindhart* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Colonel George J. McCartin, Jr., Captain Monte Engler,* and *Captain Frederick O. Frederickson.*

*Captain Charles T. Frew, III,* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant* and *Captain Benjamin G. Porter.*

## Opinion of the Court

DARDEN, Judge:

Contrary to his plea, the appellant was tried and convicted of involuntary manslaughter. Our point of interest in the case is whether the evidence is legally sufficient to sustain the court's finding.

Involuntary manslaughter as defined by Article 119(b)(1) of the Uniform Code of Military Justice, 10 USC § 919, is the killing of a human being by culpable negligence unaccompanied by an intent to kill or to inflict great bodily harm.

The Manual for Courts-Martial, United States, 1969, in paragraph 198*b*, defines culpable negligence as:

". . . [A] degree of carelessness greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission."

" '[R]eckless or wanton, showing a disregard of human safety,' " is another way of defining the term. It is "higher in magnitude than simple inadvertence, but falls short of intentional wrong," said this Court in United States v Riggleman, 1 USCMA 336, 339,

3 CMR 70 (1952). The question, then, is whether Caplinger's conduct reaches this degree of neglect.

Opposing parties in this trial agreed by way of stipulation that Guenter Grimm died instantly from injuries received in a collision between his Isetta automobile and a U.S. Army 3/4-ton truck that the accused drove and that had been traveling on Highway L–387 in a direction opposite to that of the victim.

The testimony of prosecution witnesses is that on the morning of March 12, 1969, Caplinger, a motor pool sergeant and mechanic, drove the truck from a motor pool at Schonborn, Germany, accompanied by Specialist Four Picciarelli and Private First Class Moon, their destination being a maintenance unit located in Kaiserslautern, a drive of about forty minutes. En route, they stopped at Sembach, ostensibly to cash a check. At the suggestion of the appellant, they then proceeded to a gasthaus in Otterburg, where they had lunch and a half-liter of beer each. Afterward, they traveled about a quarter of a mile before the appellant noticed that the truck brakes were not performing properly. As a consequence, they returned to the gasthaus, and after some difficulty placed a phone call to their unit. Help was promised. While waiting, Caplinger and his companions consumed two small bottles of beer each. Two hours later, help arrived, but a 2 1/2-ton truck had been sent instead of a wrecker. Attempts to connect the two vehicles were unsuccessful because of a defective tow bar. Sergeant Caplinger then decided to return to his point of departure by following the rescue truck back. Before they left, he and his fellow soldiers had another beer. His actions nonetheless were described as normal and his speech seemed coherent.

Picciarelli returned to base in the first truck, arriving about 6:00 p.m. After leaving the gasthaus parking lot he did not see Caplinger at any time during the return trip. This witness testified that it was still daylight when he returned, but the weather was cloudy and the pavement was wet from rain.

A German national, who for approximately three and one-half years had driven the same type of truck for the "American Forces," related that on the afternoon of March 12 he had painted second floor windows at his residence overlooking Highway L–387. While taking a work break between 4:30 and 5:30 p.m. he watched the road and observed an American 3/4-ton truck on a curved portion of the highway pass close to a concrete block that protected a nearby house and then proceed to cross over the dividing line into the opposite lane of this two lane highway. This vehicle then abruptly pulled back into the proper lane and safely passed the automobile of this witness that was parked in the front of his residence. He estimated the speed of the passing truck to be between fifty and sixty kilometers. He further noted that it was occupied by two people and that the front left tire appeared to be only half inflated. Fifteen minutes later he was informed of a nearby accident, went to the scene, and found what he thought was the same American truck and a small German car, both damaged and, viewed from the direction in which the truck had been headed, both sitting off the left side of the highway. In contrast to an earlier witness, he described the day as clear and dry.

A police official who was called to the scene described the truck as resting with its left wheels in a ditch with its windows partly lowered, its top torn, and the left front tire flat. There was damage to the front bumper, the right side, both right fenders, glass was broken from the windows, and pieces of glass were found in the general area. No skid marks were found, apparently because of the wet conditions. The victim's car was said to have been hit on its left at such an angle that three-fourths of the car was smashed. Photographs showing the condition of both cars were intro-

duced to supplement this oral testimony.

The officer further informed the court that at the time of the collision light rain was falling and the road was wet. From the angle of the collision, the damage done, and the lack of debris in the center and right side of the roadway, he concluded that the point of impact occurred on the side of the road that was to the appellant's left.

An Army vehicle inspector who later examined the truck testified that its steering gear was satisfactory but that its brake cylinders were leaking and that one brake shoe should have been replaced. Though still serviceable, the shoe was "right at the braking point." He also found that the vehicle "had a bent frame, bent bumper, all bows and canvas destroyed, windshield crushed in, rims bent, fenders . . . flat tire in the front." One tire had cuts and fractured walls. It appeared to have been run in a deflated condition. Because of the damage to the truck top, this witness further concluded that the truck had rolled over.

Next introduced was a stipulated agreement that blood drawn from the appellant at 7:00 p.m., March 12, 1969, contained "1.8 milligrams [of alcohol] per cubic centimeter of whole blood." In answer to a hypothetical question that incorporated this information, a physician testified of his belief that the appellant's judgment and abilities to react were impaired. Based on his own experience, however, the physician also believed that the 1.8 reading was too high. The laboratory could have erred, or Caplinger could have had more to drink than the testimony indicated.

For the defense, Private First Class Moon and the appellant depicted the circumstances of the victim's death in a different way from the prosecution. Moon testified that while at the gasthaus he and those with him consumed four bottles of beer, of which only one contained more than eight ounces. In addition, he and the appellant not only had lunch but both ate a sandwich later in the afternoon. He informed the court that on their way back to Sembach, Caplinger drove in the rain at thirty to thirty-five miles an hour in a normal manner, and that at the time of the accident Moon believed they were driving on the right side of the road, for he was conscious of the curb on his left side and did not feel the truck veer.

The appellant told the court that the brakes on the truck had not gone all the way out and that they had not deteriorated during the afternoon, that he had two large and two small bottles of beer, that he twice had food at the gasthaus, that he noted nothing unusual about his front tires until after the crash, that the victim approached from Caplinger's lane, and that good brakes would have been of little help, since the oil slicks and a light drizzle made the road slippery. He didn't know whether the truck turned over because his head was hit "quite hard" when the cars collided. He stated that he had attempted to steer from his own side of the road because of the victim's approach from the wrong side.

As is true in almost all contested cases of this type, the testimony to support a finding of involuntary manslaughter is controverted. Nevertheless, there is testimony tending to show that the accident occurred on the victim's side of the road and that the appellant (a) was under alcoholic influence at the time of the accident, (b) drove a truck with defective brakes and an improperly inflated tire over a narrow, winding, two lane road during inclement weather, (c) at least once crossed into the wrong lane before the accident, and (d) may have been driving too fast, considering the weather, the road, and the condition of the brakes. If the triers of fact believed the witnesses who testified to this effect, they had enough basis to find that the appellant was negligent and that he culpably disregarded the consequences of his negligence to human life. United States v Schultz, 1 USCMA

512, 4 CMR 104 (1952); United States v Waluski, 6 USCMA 724, 21 CMR 46 (1956); and United States v Riggleman, supra. Accordingly, we affirm the decision of the United States Army Court of Military Review.

Chief Judge QUINN and Judge FERGUSON concur.