**UNITED STATES**

v.

**Sharon Y. NELSON, 259–41–9886, Hull Maintenance Technician Third Class (E–4), U.S. Navy.**

**NMCM 97 01978.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 26 June 1997.

Decided 30 Sept. 1999.

LT Syed N. Ahmad, JAGC, USNR, Appellate Defense Counsel.

Capt Curtis M. Allen, USMC, Appellate Defense Counsel.

LT James E. Grimes, JAGC, USNR, Appellate Government Counsel.

Capt Paul D. Kovac, USMC, Appellate Government Counsel.

Before DORMAN, Senior Judge, TROIDL, Senior Judge, and ROLPH, Appellate Military Judge.

DORMAN, Senior Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to her pleas, of making a false official statement and involuntary manslaughter, in violation of Articles 107 and 119, Uniform Code of Military Justice, 10 U.S.C. §§ 907 and 919 (1994). The approved sentence includes confinement for 18 months, forfeiture of all pay and allowances, and reduction to pay grade E–1. In taking action in this case, the convening authority exercised his powers of clemency and suspended all confinement and forfeitures for a period of 1 year from the date of the action.

We have carefully reviewed the record of trial, the appellant's four assignments of error and two supplemental assignments of error, the Government's response, the appellant's reply brief, and the excellent oral arguments presented by counsel.[1] We conclude that the findings, except as noted below, and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.

### Sufficiency of Evidence

In her first assignment of error, the appellant argues that the evidence of record is insufficient to support her conviction for the involuntary manslaughter of her newborn in-

1. Oral argument was heard in this case on 4 June 1999 at the Naval Justice School in Newport, Rhode Island. Capt. C.M. Allen, USMC, argued for the appellant, and LT J.E. Grimes, JAGC, USN, argued for the Government.

fant because the infant was not born alive. In her second assignment of error, the appellant argues that the evidence is insufficient to convict her of having made a false official statement, because statements made to investigators are not "official" within the meaning of Article 107, UCMJ. The appellant's supplemental assignments of error also attack the sufficiency of evidence. In the first supplemental assignment of error, the appellant argues that the evidence was insufficient to convict her of involuntary manslaughter because it fails to establish that her conduct was culpably negligent. In her second supplemental assignment of error, she argues that the evidence concerning her conviction for making a false official statement is insufficient because she did not know her statements were false and because she had no intent to deceive.

■ The test for legal sufficiency requires this court to review the evidence in the light most favorable to the Government. In doing so, if any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt, the evidence is legally sufficient. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). With respect to both offenses of which the appellant stands convicted, that standard is met in this case.

■ The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this court is convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. In resolving the question of factual sufficiency, we have carefully reviewed the record of trial and the excellent briefs of counsel. We have given no deference to the factual determinations made at the trial level. Based on that review, we are convinced beyond a reasonable doubt of the appellant's guilt of both the involuntary manslaughter of her newborn daughter and of the false official statement she made concerning the circumstances surrounding the birth and death of her child. We find it necessary, however, to modify the findings with respect to the appellant's false official statement.

## I. INVOLUNTARY MANSLAUGHTER

*The Facts.* Late in the evening on 28 September 1996, the appellant was on board her ship, the USS SIMON LAKE (AS 33), located in her home port at La Maddalena, Italy. In that it was a Saturday evening, only a few of her shipmates were on board, and of those present, most were in the television lounge. Lights were out in the berthing areas. The appellant had returned to the ship after going into town with some friends. She was not feeling well. Her discomfort was a result of her unplanned pregnancy, which she had kept hidden from everyone. While standing between the racks in her berthing area she delivered a full term baby-girl. The baby fell into her jeans, which were down around her knees. Although the baby did not cry, the appellant heard a small whimper. The appellant picked up the baby and placed her on one of the racks and then covered her up in a blanket. She cut the umbilical cord with her pocketknife. She did not examine the baby to determine the baby's physical condition. Medical personnel were on board the SIMON LAKE at the time the baby was born.

With the baby on a nearby rack, the appellant cleaned up the natural consequences of the delivery, using sheets to wipe up the floor. She packed a small bag with personal items. She then placed the sheets in a plastic garbage bag and poked some holes in the bag. Without checking on the baby's condition, the appellant laid the baby in the bag with the sheets. She then left the ship, carrying both bags. Eventually (some 12 hours later), the appellant took herself and the baby to a civilian hospital in Olbia, Italy. The appellant was admitted to the hospital, but the baby was already dead when the appellant arrived at the hospital. Hospital staff unsuccessfully attempted to revive the baby.

Four days after the infant died, Dr. Demontis, an Italian forensic pathologist, conducted an autopsy of the appellant's infant daughter. Also attending the autopsy were the Armed Forces Regional Medical Examiner, LTCOL Marzouk, Medical Corps, USAF, and the medical officer from the SIMON

LAKE, CDR Weldon, Medical Corps, USN. As part of the autopsy, a float test was performed on the infant's lungs. It was a simple test. The lungs were placed in a bucket filled with water and they sank to the bottom. The results of this test indicate that the appellant's daughter never took an efficient breath of air. It also indicated that the infant could not have remained alive until just before the appellant took her to the hospital, as the appellant testified at trial, and as she claimed in a written statement given to investigators from the Naval Criminal Investigative Service. The autopsy also revealed that the baby was alive while passing through the appellant's birth canal and that the baby had no congenital deformities or defects.

Based upon these facts, appellant was charged with the involuntary manslaughter of her daughter. Specifically, the Government alleged that the appellant "by culpable negligence unlawfully kill[ed] her newborn infant female by failing to provide medical assistance to said infant and by failing to take steps to ensure that medical treatment and assistance were available and provided to said infant." At trial, the appellant's principal defense was that given her experiences, intelligence, and actions, her conduct did not rise to the level of culpable negligence. While the military judge did instruct the members that they needed to be convinced that the appellant's infant daughter had been born alive before she could be convicted of either involuntary manslaughter or negligent homicide, the appellant did not argue that issue to the members.

*Discussion.*

a. *Was the appellant's daughter born alive?*

■ The appellant contends that her conviction for involuntary manslaughter must be set aside because the evidence is both factually and legally insufficient to prove that her infant daughter was a "living human being." Appellant's Brief of 25 August 1998 at 3 (citing Wayne R. LaFave and Austin W. Scott, Jr., Criminal Law 607 (2d ed.1986)). The appellant also suggests that support for her position can be found in those cases

affirming a woman's right to abort her fetus. *See Planned Parenthood v. Casey*, 505 U.S. 833, 913, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Roe v. Wade*, 410 U.S. 113, 162, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The issue the appellant raises merits serious contemplation.

The applicable portion of Article 119, UCMJ, provides that, "[a]ny person ... who, without an intent to kill or inflict great bodily harm, unlawfully kills a **human being** ... is guilty of involuntary manslaughter and shall be punished as a court-martial may direct." (emphasis added.) Thus, the requirement that the decedent be a "human being" is contained in the statute itself. In most homicide cases there is no question of whether the decedent was a "human being", because that term:

> *ordinarily* has a universal meaning in the lay mind as well as the legal. In the ordinary case where the evidence relates to a dead body of such age or physical development that there can be no question but that the dead person had a separate and independent life prior to death, there is no need or advantage in giving amplifying or clarifying instructions defining the term human being....

*United States v. Gibson*, 17 C.M.R. 911, 935, 1954 WL 2725 (A.F.B.R.1954). In a case such as the one before us, however, where there is some evidence that the decedent was not born alive, it is appropriate to instruct the members in a manner that aids them in determining whether the decedent was a human being. *Gibson*, 17 C.M.R. at 935. It is also necessary for this court to consider the meaning of those terms in determining whether the evidence was both legally and factually sufficient to sustain the appellant's conviction for involuntary manslaughter.

The appellant and the Government agree that, before an infant can be the victim of a homicide, it must be determined that the infant was "born alive." Appellant's Brief at 3; Government's Brief at 7. Predictably, they do not agree on what that term means. The appellant defines the term as "whether the child is carrying on its being without the help of the mother's circulation, whether the child takes a breath of air, and whether the

child cries." Appellant's Brief at 3. The Government does not propose a single definition of the term, but rather focuses on whether the child was "capable of existence by means of circulation independent of [its mother.]" Government's Brief at 8 (citing *People v. Hayner*, 300 N.Y. 171, 90 N.E.2d 23, 24 (1949)). Under the Government's theory "expansion of the lungs was of no great moment because the legal test of live birth—possession by the child of a separate circulation **made irrelevant the question whether the child had breathed or not.**" *Id.* at 8–9 (quoting *Hayner*, 90 N.E.2d at 25)(emphasis in brief). The Government also finds support for this position in definitions of "live birth" taken from various state statutes and from medical treatises as an indicator of whether a child was "born alive." In her Reply Brief, the appellant objects to reference to those sources. Her objection, however is based upon medical evidence she introduces to this court from outside the record.[2]

Neither the UCMJ nor the Manual for Courts–Martial defines the term "human being," or the term "born alive." Furthermore, since there is no binding case law defining those terms for this court, we write on a clean slate. Both the appellant and the Government urge us to adopt the "born alive" rule outlined in *Gibson*. Adoption of such a rule seems the logical precursor to a determination of the "human being" status required of a victim of a homicide. The *Gibson* "born alive" rule has only two requirements. First, that the child be wholly expelled from the mother. Second, that the child possess or be capable of an existence by means of circulation independent of its mother. *Gibson*, 17 C.M.R. at 926. Quoting from the *Hayner* opinion, *Gibson* continues, "[t]he true test of separate existence in the theory of the law (whatever it may be in medical science) is the answer to the question 'whether the child is carrying on its being without the help of the mother's circulation.'" *Id.* Significantly, the *Gibson* court also found the

application of this rule to be a "sound application of common law principles *in the light of modern advancements in medical knowledge of human physiology.*" *Id.* (emphasis added.) The critical portion of the "born alive" rule is defining what it means to exist or be capable of an existence by means of a circulation independent of one's mother.

In attempting to define these terms, the Government focuses on state statutes that define "live birth." The appellant notes that these statutes concern the states' interest in compiling vital statistics, and argues that they, therefore, have no application to criminal law. The appellant presents no support for this argument, nor a cogent rationale for her position. The fact that these statutes are the basis upon which a state records a live birth seems to us to be a compelling reason to consider them in attempting to determine whether the victim in this case was a human being. Having examined numerous state statutes, we cite as a representative sample the following taken from a well recognized legal source:

> **Born alive.** Refers to product of conception after complete expulsion or extraction from mother, irrespective of the duration of pregnancy, which breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached. Each product of such birth is considered live born and fully recognized as a human being.

BLACK'S LAW DICTIONARY 184 (6th ed.1990)(citing ME.REV.STAT. ANN., tit. 22, § 1595). Furthermore, because both the "born alive" rule from *Gibson* and these state statutes focus on the individual after being fully expelled from the mother, we find that the appellant's attempts to link the facts of

---

2. Specifically, appellant cites to medical textbooks to present evidence concerning an infant's cessation of dependence on its mother for oxygen, nutrition, and elimination of bodily wastes. Citing those textbooks, she states that when a newborn takes its first breath, the pressure differential in the chest cavity causes the foramen ovale and ductus arteriosus to close, allowing blood to circulate through the baby's lungs. Reply Brief at 2. It is at that point, she argues, that an infant establishes a circulation independent of its mother. *Id.* We, however, are constrained to limit our review to the evidence of record. Article 66(c), UCMJ.

this case to legal theories supporting abortion are misplaced. In this case, we are not dealing with the "viability" of a fetus. We are concerned with whether a full term child was born alive.

The appellant also goes to considerable lengths to argue that the language from *Gibson* concerning an infant's capability of existence independent from the mother has nothing to do with the possibility of sustaining life. She argues that it means the present ability to sustain life. Appellant's Brief of 25 August 1998 at 7–8, Appellant's Reply Brief of 25 January 1999 at 7–10. The appellant's focus fails to account for the commission of acts that prevent an infant fully expelled from its mother from existing on its own means, and it also fails to account for modern advancements in medicine.

In deciding this first issue, we believe that public policy demands that a newborn infant, wholly expelled from the mother, be afforded the maximum protection possible under the law. To ensure that protection, we adopt a **"viability outside the womb"** standard. That standard applies the born-alive rule used in *Gibson* to the extent that it requires the infant be fully expelled from the mother, and that the infant have the capability of existing independent from the mother's circulatory system. Thus, if a newborn infant was simply capable of existing once fully expelled from the mother, the infant was born alive. The answer to the question of whether the infant successfully drew its first breath is not controlling.

■ This standard also requires a determination of whether that capability exists. To make that determination, we adopt BLACK'S LAW DICTIONARY's definition of "born alive," and conclude that an infant need not be breathing at the time it is fully expelled from its mother so long as it "shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord or definite movement of voluntary muscles...." BLACK'S LAW DICTIONARY at 184. In making this determination, as recognized by the *Gibson* court, it is also appropriate to consider current medical technology.

■ In applying these standards, we find beyond a reasonable doubt that the evidence of record supports the conclusion that the appellant's infant daughter was born alive. Three doctors testified at the appellant's court-martial. They all agreed that the infant was alive while she passed through the appellant's birth canal. The hemorrhages in the infant's eyes and one under her scalp are evidence of that fact. The examining physicians all agreed that the baby had no congenital defects that would have caused death. They also agreed that the infant died of lack of oxygen. Dr. Weldon, the medical officer on board the SIMON LAKE, testified that the victim probably died of primary apnea— the failure to take an efficient first breath of air. Dr. Marzouk, the Armed Forces regional Medical Examiner, testified that the baby passed through the birth canal alive and that it would have survived with medical attention. In his medical opinion, the cause and mechanism of death were undetermined, but he was positive that the baby never took an efficient breath of air. The fact that the baby's umbilical cord was not clamped may have contributed to the infant's death. Dr. Demontis, an Italian forensic pathologist who performed the autopsy, also agreed that the infant was probably alive as it began to pass through the birth canal, but he suggested that the cord could have been wrapped around the baby's neck, cutting off oxygen. This suggestion was only a "hypothesis," however. Record at 334. What is certain, is that the infant died of asphyxia, the lack of oxygen. Dr. Marzouk discounted the hypothesis that the infant's cord was wrapped around its neck. Record at 217–22. Additionally, the appellant testified that when the baby was delivered she thought that she heard it make a small whimper. Record at 271. Applying the standard announced above to these facts, without reference to the current state of medical advances, we are convinced beyond a reasonable doubt that the appellant's daughter was born alive.

b. *Was the appellant culpably negligent?*

The appellant next contends that her conviction should be set aside because her conduct with respect to her daughter did not amount to culpable negligence. She con-

tends that, given the circumstances surrounding her daughter's birth, neither her failure to provide the infant with medical care, nor her failure to take steps to ensure that medical treatment and assistance was available to her daughter, constituted culpable negligence. Appellant's Supplemental Assignments of Error of 13 May 1999 at 4–7.

Culpable negligence is a degree of carelessness greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), Part IV, ¶ 44c(2)(a)(i). Culpable negligence is a "reckless or wanton act, showing a disregard of human safety. It is higher in magnitude than simple inadvertence, but falls short of intentional wrong." *United States v. Banks*, 39 M.J. 571, 575 (N.M.C.M.R.1993)(citing *United States v. Riggleman*, 1 C.M.A. 336, 3 C.M.R. 70, 1952 WL 1835 (1952)), *aff'd*, 40 M.J. 320 (C.M.A. 1994). "The actor need not actually intend or foresee the consequences. It is only necessary that a reasonable person in such circumstances would have realized the substantial and unjustified danger created by his act." *United States v. Cowan*, 39 M.J. 950, 955 (N.M.C.M.R.1994)(citing *United States v. Baker*, 24 M.J. 354 (C.M.A.1987)), *aff'd*, 43 M.J. 406 (1995).

The appellant correctly points out that there are no reported military cases in which an accused has been convicted of involuntary manslaughter based upon the failure to obtain medical attention for a newborn infant. The case of *United States v. Riley*, 47 M.J. 603 (A.F.Ct.Crim.App.1997), is factually similar, but Airman Riley was convicted of unpremeditated murder of her newborn daughter. On appeal, the Air Force Court of Criminal Appeals set aside her conviction but affirmed a conviction of involuntary manslaughter based upon a theory of culpable negligence. *Riley*, 47 M.J. at 609. The Court of Appeals for the Armed Forces reversed the decision of the Air Force Court because the Government had not proceeded on the theory of culpable negligence at trial. *United States v. Riley*, 50 M.J. 410 (1999). Earlier cases, however, give support to the theory of prosecution used by the Government in this case.

In *United States v. Valdez*, 40 M.J. 491 (C.M.A.1994), our superior court upheld a conviction for unpremeditated murder of a child by her father. The theory of the case in *Valdez* was that the child's father had caused her death through physical abuse combined with his withholding of medical treatment. *Valdez*, 40 M.J. at 495. The case acknowledged the "longstanding duty of parents to protect and care for their children," and that there was no evidence of a "congressional intent to shield parents from criminal responsibility for killing their helpless children, in whole or in part, by the withholding of vital medical attention." *Id.* In *Valdez*, the victim was 8 years-old. Without detracting from the duty owed by the parent of an 8–year–old child to protect and care for that child, in our view an even greater duty exists with respect to a parent's obligations to an infant.

In *United States v. Martinez*, 48 M.J. 689 (Army Ct.Crim.App.1998), the accused was convicted of the involuntary manslaughter of his 1–year–old stepson. The theory of the Government's case was that the victim died as a result of severe physical abuse inflicted by his mother, and due to the failure of the accused to act on the victim's behalf. In affirming the conviction, the court found that the accused had "failed in his duty as [a] father to honor the 'inherent dependency of a child upon his parent' for care and medical aid." *Martinez*, 48 M.J. at 691 (quoting *United States v. Robertson*, 37 M.J. 432, 440 (C.M.A.1993)(Gierke, J., concurring)). In *Robertson*, our superior court reversed the accused's conviction for negligent homicide. Robertson's son died as a result of an eating disorder and the Government proceeded on the theory that Robertson was negligent in failing to obtain medical treatment for his 15–year–old son. The evidence in that case, however, revealed that the accused had attempted to obtain treatment for his son, but that the son refused to cooperate. In reversing the conviction, the court stated, "we are at a loss how reasonable factfinders could find appellant's course of caring for his son to be criminally at odds with what a 'reasonably

careful' parent would have done under the same or similar circumstances." *Robertson,* 37 M.J. at 439.

Prosecution under theories closely related to culpable negligence has been upheld in several states. In *Hall v. State,* 493 N.E.2d 433 (Ind.1986), the Indiana Supreme Court upheld the conviction of both parents for the reckless homicide of their son. Their son died after suffering through a 5–day bout of acute bronchial pneumonia. Based upon their religious beliefs, his parents sought spiritual healing for their son, but did not seek medical treatment. Under the Indiana statute, a person engages in reckless conduct when he "engages in conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." *Hall,* 493 N.E.2d at 435; IND.CODE § 35–41–2–2 (Burns 1985 Repl.).

In another case involving faith healing, the parents of a mature minor female were convicted in Pennsylvania of involuntary manslaughter following her death related to diabetes acidosis. The Pennsylvania involuntary manslaughter statute provided, "[a] person is guilty of involuntary manslaughter when as a direct result of doing an unlawful act in a reckless or grossly negligent manner or doing an lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 PA. CONS. STAT. § 2504 (1999). In finding that the parents of Shannon Nixon had a duty to override her own religious beliefs and obtain medical care for her, the Superior Court of Pennsylvania found that their failure to obtain that assistance for her satisfied the statutory requirement. *Commonwealth v. Nixon,* 718 A.2d 311, 313 (Pa.Super.1998). In deciding the case, the court elaborated on parental obligations:

> A parent has the legal duty to protect her child, and the discharge of this duty requires affirmative performance. The inherent dependency of a child upon his parent to obtain medical aid, i.e. the incapacity of a child to evaluate his condition and summon aid by himself, supports imposition of such a duty upon the parent.

*Nixon,* 718 A.2d at 313 (quoting *Commonwealth v. Barnhart,* 345 Pa.Super. 10, 497 A.2d 616, 621 (1985)).

It is clear that all of the above cases have applied a reasonable person standard in determining whether the accused in each case was negligent, and, if so, to assess the degree of that negligence. Applying the legal principles contained in these cases, it is also clear that the appellant in this case had a duty to provide care for her infant daughter. The appellant admitted as much when she acknowledged that she should have sought medical assistance when she realized she was about to give birth, and that she should have checked on the condition of her child before she laid her on a rack and covered her with a blanket. Record at 282, 290–91. In our view, any reasonable person would have realized that such omissions would create a substantial and unjustified danger for a newborn infant.

Although it is true that many women give birth without the assistance of medical personnel, that is not the norm in our society. Dr. Weldon described what a reasonable person would do when she responded to a question during cross-examination as to whether having medical personnel assist with birth would be considered "super-cautious."

> No, I don't think it's the most super-cautious way of dealing with birth. I think it's the average way of dealing with birth. I think the majority of people in America choose to have their children with some degree of medical provision available, be it a hospital or a home delivery with a midwife or at a birthing center. But most people choose to have someone present to assist with the delivery. I don't think that's super-cautious. I think that's simply prudent.

Record at 198.

The appellant chose the less prudent course. In spite of the availability of medical personnel on board the ship at the time she was giving birth, she opted to go it alone. She did not even ask for assistance from those who were apparently nearby in the TV lounge next to the berthing compartment where her daughter was born. Furthermore, after the baby was born, the appellant

did not even check on her daughter until an hour after the birth. By that time it was too late. The appellant's conduct clearly breached her parental obligation to protect her daughter, and was a substantial departure from acceptable standards of conduct.

Based on an evaluation of the evidence and the applicable legal standards, we find beyond a reasonable doubt that the appellant had a duty to: evaluate the condition of her newborn daughter; provide medical assistance to her; and take steps to ensure that medical treatment and assistance were available for her. We also find beyond a reasonable doubt that the appellant breached those duties in a manner that constituted culpable negligence. Finally, we are convinced beyond a reasonable doubt that the evidence of record is both legally and factually sufficient to sustain the appellant's conviction of the involuntary manslaughter of her daughter by culpable negligence.

## II. FALSE OFFICIAL STATEMENT

In her second assignment of error, the appellant attacks the sufficiency of the evidence with respect to her conviction for making a false official statement. The thrust of her argument is that the statement she made to investigators was not made in the line of duty, and thus was not official. In her second supplemental assignment of error, the appellant attacks the sufficiency of the evidence concerning the false official statement alleging that she neither knew the statement to be false, nor had the intent to deceive. The Government contests both assignments of error.

**The Facts.** The appellant stands convicted of having made a false official statement to criminal investigators who were conducting an investigation into the death of the appellant's infant daughter. The appellant's statement was made on 5 October 1996, after she was advised of her rights and after being told that she was suspected of "homicide." Prosecution Exhibit 5. In that statement, the appellant provided details about how she took the baby off the SIMON LAKE around

0030 on 29 September 1996. She also stated that she held the baby for the first time when she was on the beach at Palau, and that the baby "made little noises." She further related that she took the baby to a hotel, where she played with her and cleaned her up in preparation of taking the baby to the hospital. Once, on the way to the hospital, she stopped off at a store to buy some items for the baby. It was while shopping that she noticed that the "baby was beginning [sic] change colors and have [sic] problems breathing." She then quickly took the baby to the hospital. All the medical evidence of record, however, establishes that the infant never took an efficient first breath of air. The infant could not have lived until shortly before the appellant took her to the hospital at Olbia. While appellant was not obligated to make a statement to the investigators from the Naval Criminal Investigative Service, she did so after having been properly advised of her rights.

*Discussion.*

a. *Was the appellant's statement "official"?*

■ The appellant's primary support for her position that her statement was not an official statement is the Manual for Courts–Martial, Part IV, ¶ 31c(6)(a). That provision provides that "[a] statement made by an accused or suspect during an investigation is not an official statement within the meaning of the article if that person did not have an independent duty or obligation to speak." Citing *United States v. Guess*, 48 M.J. 69 (1998), the appellant argues that "absent a contrary intent in the Constitution or a statute, this Court should adhere to the Manual's element's of proof." Appellant's Brief at 10. She also finds support in *United States v. Davis*, 47 M.J. 484 (1998).

In *Davis*, our superior court held that "where the President unambiguously gives an accused greater rights than those conveyed by higher sources, this Court should abide by that decision unless it clearly contradicts the express language of the Code." [3]

---

**3.** In *Davis*, the Court of Appeals for the Armed Forces overturned Davis' conviction for aggravated assault. The Court held that when Davis placed an unloaded pistol at the head of an

*Davis,* 47 M.J. at 486; Appellant's Brief at 10. Recognizing that this court has previously held that a false statement given to investigators by a suspect is a violation of Article 107, UCMJ, the appellant asks us to reconsider that holding in light of *Davis* and *United States v. Solis,* 46 M.J. 31 (1997). In *Solis,* the Court of Appeals for the Armed Forces affirmed a conviction under Article 107, UCMJ, and rejected the application of the "exculpatory no" doctrine to that article. Three members of that court (Chief Judge Cox and Judges Crawford and Effron), however, reserved judgment as to whether the Manual's provisions "are intended to establish a procedural right that can be invoked by an accused or whether they constitute internal guidelines intended only to regulate government conduct." *Solis,* 46 M.J. at 35–36. The arguments presented by the appellant are cogent and persuasive, and the language of Manual for Courts–Martial, Part IV, ¶ 31c(6)(a) is "unambiguous." On this subject, however, we do not write on a clean slate.

Twice in the recent past the Court of Appeals for the Armed Forces has firmly reminded the Courts of Criminal Appeals of the need to follow its precedents. Even where we disagree with a holding of our superior court, our obligation is to follow binding precedent, and perhaps recommend reconsideration of that precedent. *See United States v. Kelly,* 45 M.J. 259, 262 (1996); *United States v. Allbery,* 44 M.J. 226, 228 (1996). Neither *Davis* nor *Solis,* however, are binding precedent on the issue the appellant raises before the court. That issue was squarely addressed by our superior court in *United States v. Prater,* 32 M.J. 433 (C.M.A. 1991).

Consistent with his guilty plea, Army Staff Sergeant Prater was convicted of violating Articles 107 and 121 (larceny), UCMJ. His conviction for larceny was based upon his obtaining over $12,000 in military benefits by representing himself as being married to the woman with whom he was living. She, however, was not his wife. When Staff Sergeant Prater's marital status came under scrutiny, he was called in for questioning concerning his marital status. His false statement to the investigators that he was married to the woman with whom he was living, made after he was advised of his rights, led to his conviction under Article 107, UCMJ.

The granted issue in Prater's appeal challenged the providence of his guilty plea on the basis of the "exculpatory no" doctrine. In reviewing the facts of the case, the Court of Military Appeals, now the Court of Appeals for the Armed Forces, found that the record did not establish a substantial basis that the defense existed in that case. *Prater,* 32 M.J. at 437. Thus, the appellant's guilty plea was provident. The court did not stop there, however. It specifically addressed Prater's "alternative, if not somewhat overlapping, argument ... that his false statements to military investigators were not 'official' within the meaning of Article 107." In rejecting his "alternative argument," the court held, "where warnings under Article 31 are given to the criminal suspect, as in the present case, his duty to respond truthfully to criminal investigators, if he responds at all, is now sufficient to impute officiality to his statements for purposes of Article 107." *Id.* at 438.

This, to us, is clear guidance and binding precedent. Following the proscriptions of *Kelly* and *Allbery,* we not only adhere to that guidance and precedent for purposes of this appeal, but we also recommend that it **not** be reconsidered.[4] Accordingly, by application of

individual whose hands and feet were bound together and said, "I ought to cap you now," his conduct amounted to only a simple assault. The Court's decision was based upon the express language of the MCM, Part IV, ¶ 54c(4)(a)(ii). That Manual "explanation" of aggravated assault provides that "an unloaded pistol, when presented as a firearm and not a bludgeon, is not a dangerous weapon or a means of force likely to produce grievous bodily harm, whether or not the assailant knew it was unloaded." The court, however, distanced itself from finding any logic in this rule "promulgated by the President, not by a majority of this Court." *Davis,* 47 M.J. at 487, note.

4. To underscore our recommendation, we note Judge Oliver's comments in a recent decision of this court:

In *United States v. Watkins,* 35 M.J. 709, 714 (N.M.C.M.R.1992), this court concluded that this language from the Manual "is no longer an accurate statement of the law, at least inso-

the case law cited above, we find that the statement the appellant made to the criminal investigators on 5 October 1996 was an official statement.

### b. *Did the appellant have knowledge and the intent to deceive?*

 The appellant argues that the Government failed to prove that she knew that her statement was false. In support of this argument, she relies solely upon her in-court testimony, during which she recounted the story as contained in her 5 October 1996 statement. She further argues that her testimony establishes her belief that her story was true. And, if she believed it to be true, there could be no intent to deceive. Appellant's Supplemental Assignment of Error of 13 May 1999 at 8–9.

To sustain a conviction for making a false official statement, we must be convinced beyond a reasonable doubt of each of the four elements of that offense. Those elements are: (1) that the accused . . . made a certain official statement; (2) that the . . . statement was false in certain particulars; (3) that the accused knew it to be false at the time of . . . making it; and (4) that the false . . . statement was made with the intent to deceive. *United States v. Solis*, 46 M.J. at 32; MCM, Part IV, ¶ 31b (1995 ed.). As with each element, the Government bears the burden of proving beyond a reasonable doubt that the accused actually knew the statement was false. *United States v. Acosta*, 19 C.M.A. 341, 41 C.M.R. 341, 343, 1970 WL 7345 (1970); MCM, Part IV, par. 31c(5) (1995 ed.). Furthermore, an honest belief in the truth of a statement tends to negate the existence of the intent to deceive. *Acosta*, 41 C.M.R. at 343.

In this case, the Government alleged that appellant's statement was false in three respects: (1) that her baby was alive when she departed USS SIMON LAKE at about 0015

on 29 September 1996; (2) that the baby was alive for several hours thereafter; and (3) that the baby only died shortly before she arrived at a hospital in Olbia, Sardinia, Italy.

We find this issue to be solely one of credibility. Reasonable doubt, however, does not mean that the evidence must be free from conflict. *See United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986). In this case, we find the medical evidence compelling. Based on that evidence, we do not believe that the appellant had an honest mistake of fact concerning whether her daughter was alive when she first examined her on the beach at Palau. Record at 273. We do find merit in the appellant's argument concerning the first of the three statements that the Government alleged was false (i.e., that she believed her baby was alive when she left the ship).

The appellant testified that she did not examine the baby until about an hour after it was born. She also testified that she poked holes in the plastic bag she used to carry the baby off the ship. Part of the Government's theory concerning the appellant's culpable negligence is the fact that the appellant did not examine her daughter at the time she was born. She wanted to keep the baby quiet after she had her baby on board the ship. It is thus reasonable to believe that at the time she took the baby off the ship, she did not know its condition. Thus, we are not convinced beyond a reasonable doubt that the Government proved that the appellant knowingly lied when she told the investigators that her baby was "alive" when she carried the baby off the ship. We will delete that language in our decretal paragraph. With this noted exception, based upon our review of the record, and upon consideration of the applicable standards of review, we find that the evidence is both legally and factually sufficient to sustain the appellant's conviction of a violation of Article 107, UCMJ.

far as it would apply to statements made to law enforcement agents conducting official investigations." Moreover our higher court has observed, particularly when preceded by a valid warning under Article 31, . . . statements made to criminal investigators are official within the meaning of Article 107. . . . *United States v. Prater*, 32 M.J. 433, 438 (C.M.A.1991); *United*

*States v. Jackson*, 26 M.J. 377, 379 (C.M.A. 1988) (construing Art. 107 . . . consistent with the construction of 18 U.S.C. § 1001 in *United States v. Rodgers*, 466 U.S. 475, 480, 104 S.Ct. 1942, 1946–47, 80 L.Ed.2d 492 (1984)).
*United States v. Morris*, 47 M.J. 695, 701–02 (N.M.Ct.Crim.App.1997).

## III. INSTRUCTIONAL ERROR

The appellant next alleges that the military judge committed plain error when he instructed the members that the victim could be considered to have been born alive if she were capable of breathing on her own. Appellant's Brief at 11. We find no error.

*The Facts.* Following the presentation of evidence on the merits the military judge told the trial and defense counsel that, given the evidence presented, he believed it appropriate to "fashion an instruction as to the definition of a human being." Record at 348. He further told them that he intended to draft it using the standard contained in the *Gibson* case. Neither the trial counsel nor the defense counsel objected. *Id.* Then, after having had an opportunity to view the proposed instruction and an opportunity to object, the defense counsel stated there were no objections. *Id.* at 350. The appellant, however, offered some proposed instructions. *Id.* at 351; Appellate Exhibit XV. Concerning the instruction defining the term "human being" the appellant offered this.

> The test for determining whether a newborn child has obtained the status of a human being so as to be the subject of a homicide is whether the child had obtained a separate or independent existence, that is whether the child was carrying on its being by breathing on its own without the help of the mother's circulation.

Appellate Exhibit XV, ¶ 3a. The appellant cited *Gibson* as support for the proposed instruction. In further discussions with the military judge, the appellant stated that paragraph 3a of her proposed instructions was "fairly covered by the instructions that were hammered out between this court and counsel in this case." Record at 352.

Following arguments of counsel, the military judge issued his instructions. He instructed, in part, as follows:

> Both the greater offense of involuntary manslaughter and the lesser offense of negligent homicide require proof beyond a reasonable doubt that the child was born alive in the legal sense, that is, the child

had been wholly expelled from its mother's body and possessed or was capable of an existence by means of circulation independent of the mother's. Included in the term circulation is the child's breathing or capability of breathing from its own lungs. For the accused to be found guilty of involuntary manslaughter or the lesser offense of negligent homicide, you must be convinced beyond a reasonable doubt based upon the evidence that the accused's newborn infant was born alive. If you are not convinced beyond a reasonable doubt that the accused's newborn infant was wholly expelled from her mother's body and possessed or was capable of an existence beyond—excuse me, existence by means of circulation, independent of the accused, you must find the accused not guilty of the greater offense of involuntary manslaughter and the lesser offense of negligent homicide.

Record at 374–375. Following the instructions, the appellant's counsel once again voiced no objections. Record at 380.

■ **Discussion.** A military judge has wide discretion in determining what instructions he will issue. *United States v. Smith,* 34 M.J. 200, 203 (C.M.A.1992). Furthermore, an accused's failure to object to the instructions given constitutes waiver. RULE FOR COURTS-MARTIAL 920(f), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). Where there is waiver, the military judge's discretionary decisions concerning instructions should not be reversed unless plain error exists. *Id.*; *Smith,* 34 M.J. at 203–04. It is the appellant's burden, however, to establish plain error. She has failed to do so in this case. Finally, based upon our earlier discussion of the "born-alive" rule as it related to the sufficiency of the evidence, we specifically find that the military judge's instruction, set out above, was correct.

## IV. APPELLATE REVIEW

In regards to appellant's last assignment of error,[5] we note that it totally ignores the

5. VI. THIS COURT, BY REQUIRING ONLY ONE JUDGE OF THE PANEL TO READ THE RECORD OF TRIAL BEFORE THE PANEL IS- SUES A DECISION, VIOLATES ITS OBLIGATIONS UNDER ARTICLE 66, UNIFORM CODE OF MILITARY JUSTICE.

holding of this court in *United States v. Kolly,* 48 M.J. 795, 796 (N.M.Ct.Crim.App. 1998), decided prior to submission of appellant's brief to this court.

In *Kolly,* we summarily dismissed an identical assignment of error. We do so again here.

## V. CONCLUSION

Accordingly, we affirm the findings of guilty, except for the following: with respect to the specification under Charge I, we except the following language from line 6 of the specification, "her baby was alive." We find the appellant not guilty of this excepted language and order it dismissed. Based upon this action, we have reassessed the appellant's sentence in accordance with the principles of *United States v. Cook,* 48 M.J. 434 (1998), *United States v. Peoples,* 29 M.J. 426, 428 (C.M.A.1990), and *United States v. Sales,* 22 M.J. 305, 307–08 (C.M.A.1986). Upon reassessment, the sentence, as approved by the convening authority, is affirmed.

Senior Judge TROIDL and Judge ROLPH concur.